Sammie Lewis SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 69464.

Court of Criminal Appeals of Texas, En Banc.

Oct. 18, 1989.

Sam Ogan, court appointed, Mike Carper, court appointed, Lubbock, for appellant.

Travis S. Ware, Dist. Atty. & R. Deniece Jones, Jim Bob Darnell & Brad Underwood, Asst. Dist. Attys., Lubbock, Robert Huttash, State's Atty.; Austin, for State.

## OPINION

CLINTON, Judge.

Appellant was convicted of the offense of capital murder under V.T.C.A. Penal Code,

§ 19.03(a)(2). In accordance with Article 37.071, V.A.C.C.P., his punishment was assessed at death. Pursuant to that same provision, appeal of the judgment to this Court is automatic.

In the early evening of October 26, 1984, Lynn Cowan returned from work to his duplex home in Lubbock to find his wife, Shalyn, had been sexually assaulted and murdered. On the morning of November 8, 1984, appellant voluntarily appeared at the police station where, over the course of the next eight hours, he was questioned, eventually signing a confession to the rape and murder of Shalyn Cowan. At the time appellant was a 33 year old man, described variously at trial as "severe," "borderline," and "trainable" mentally retarded.

## I.

█ Appellant does not now challenge sufficiency of the evidence to support the jury's verdict finding him guilty of the offense. However, in his fourth point of error he does contend the evidence is insufficient to support the jury's affirmative answer to the second special issue submitted at the punishment phase pursuant to Article 37.071(b)(2), supra, which inquires "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" We agree the evidence is deficient in that respect.

Analysis begins with the facts of the instant offense. *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex.Cr.App.1986). Circumstantial evidence suggests the victim was tied with pantyhose to the headboard of her bed and sexually assaulted. She was apparently then untied and stabbed fourteen times in the chest and back, including once through the heart. In his signed confession appellant admitted: "After I raped her I decided to kill her and kind of went crazy for a few minutes." The forensic pathologist testified she would have died within a minute of sustaining the heart wound. He testified it was "a brutal death" but not "extremely" brutal. He characterized it as "a very typical sex murder." Photographs of the scene depict rel-

atively little blood. During redirect examination of the pathologist the following colloquy occurred:

"[Q] Let me ask you this: if Shalyn were taken to the bed, tied up with these pantyhose, raped while tied up with the pantyhose, untied for whatever reason, and then stabbed to death, would that fit your observations?
A That's exactly. Otherwise there would have been blood when you reconstruct the scene. Yes.
Q And I believe you stated that, in your opinion, this was typical of a sex murder?
A Normally sex related crimes are associated with over-killing.
Q If someone wanted to cause the death one blow to the heart would do it, is that right?
A Well, let me explain that also. When a person is stabbed you have a fatal wound, and you are dying because of hypoglymia, you are losing—you are bleeding internally. What happens to you, your heart is not getting enough blood supply, is getting oxygen-poor blood, or very little amount of blood. So what happens to the heart muscle? The heart muscle starts failing. And what happens when the heart starts failing? You start going into edema, into heart failure. And what happens to that? And people start making a lot of odd noises, start foaming, and she did have that, by the way. And when that happens then normally that is the next thing, to quit that—I guess it gets into the nerves. They just over-kill at that point. They want her to stop, and they just keep on going."

From this we gather that in the mind of the State's own expert the offense for which appellant was convicted was not shocking or otherwise extraordinary even with respect to the multiple stabbing. We cannot conclude the circumstances of the offense are so heinous or evince an "aberration of character" so peculiarly "dangerous" as alone to justify an affirmative response to the second special issue. Cf. *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982).

It has been said that § 19.03 of the Penal Code "limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses." *Jurek v. State*, 522 S.W.2d 934, at 939 (Tex.Cr.App. 1975). To hold the offense itself in this cause was sufficient to prove future dangerousness would threaten to undermine the function of Article 37.071, supra, to further narrow the class of death-eligible offenders to less than all those who have been found guilty of an offense as defined under § 19.03. See *Roney v. State*, 632 S.W.2d 598, at 603 (Tex.Cr.App.1982).

In urging other evidence was sufficient to establish future dangerousness, the State highlights a number of events occurring in the weeks prior to the offense, while appellant was working for Lester Humphrey Pest Control. Company records reflected that on October 4, 1984, appellant obtained a passkey from the property management company which handled the Cowans' and several adjacent duplexes, and sprayed those residences. Sandra Wymore, who lived with her husband and child in the duplex next door to the Cowans, testified that at approximately this date she allowed appellant into her home to spray under the sink. Some time during the following week appellant appeared at the Wymores' door again to inquire whether he had sprayed there. When told he had, appellant left. Fifteen minutes later as she was leaving to go to the grocery store, Wymore was again approached by appellant about whether he had sprayed her unit. Arriving home later, Wymore was approached by appellant yet a third time with the same inquiry. Wymore did not see the pest control company's truck; nor did she see a spray can in appellant's possession. She testified she was "upset" by appellant's "weird" behavior.

A friend of appellant's, Linda Moore, related a conversation she had with appellant about a week before the offense in which he complained of marital problems. Appellant lamented, among other things, that he was "a hot-blooded man who wanted sex all the time," while his "wife only wanted sex once a month[.]" Also on this occasion Moore observed what could have been a knife in appellant's possession.

Finally, the State presented testimony from Richard Mills, the only witness at the punishment phase of trial. Mills testified he was a firefighter by profession, but had worked parttime in the summer of 1984 as a yardman. Sometime in late August or early September, as he was cutting grass for an apartment complex, he was approached by appellant. Appellant had a list of apartments to spray, and was looking for a particular apartment number. Mills tried to direct appellant, but appellant did not seem to understand, and soon lost interest, lighting a cigarette and striking up a conversation. In the course of the conversation appellant displayed what seemed to Mills to be an "abnormal" interest in the women lounging beside the apartment pool: "He would like gesture at them, and he would make sounds like 'oohs' and 'aahs' and things of that nature." He appeared to Mills to have "a little bit more difficulty keeping himself under control than myself or any other people that might have been in that area." Appellant confided the hope "that while he was there spraying the apartments ... that one of these girls live in, that maybe he would get lucky and one of them would want to lay him when he went inside the apartment to spray." Appellant told Mills, "it happens all the time with electricians and plumbers."

The State argues that "this particular rape/murder, along with evidence of [a]ppellant's moral character, the possibility that he was seeking out a victim, and the fact that he considered his job as a way to find women to have sex with, all provide sufficient basis to support the jury finding that there is a probability that [a]ppellant could commit a future violent act." If by his "moral character" the State refers to appellant's avowed "hot-bloodedness" and his visions of promiscuity, such evidence has no logical bearing on propensity to commit violent crime. At no point in the conversations reported by Moore and Mills did appellant ever indicate a desire for compelled sex. Fantasies about consensual sex

on the job do not demonstrate a violent disposition. Moreover, to suggest appellant's whole reason for working at Lester Humphrey Pest Control, a job he kept only for a few months, was to get "lucky," distorts the record. For it was shown without contradiction that, though at best borderline retarded, with a limited attention span, appellant had managed to work all his adult life, never collecting unemployment compensation, albeit in a long succession of briefly held, unskilled jobs.

It has been suggested in our caselaw that "looking around" an area "for somebody to rape" may be considered evidence of forethought or calculation, and therefore "probative of [a criminal defendant's] propensity to commit future acts of violence." *Hawkins v. State*, 660 S.W.2d 65, at 82 (Tex.Cr.App.1983). It is true that appellant's "hot-blooded" nature, coupled with the presumption appellant did eventually commit the instant offense, supports an inference that on the day appellant returned to the Wymore's residence he was reconnoitering for potential victims. We note, however, that in *Hawkins v. State*, supra, there was substantial other evidence of future dangerousness. Moreover, whatever forethought may have gone into this offense evidently did not include murder, since appellant's confession shows he only decided to kill his victim after the rape was completed, and there are no contrary indicia in the record. *Huffman v. State*, 746 S.W.2d 212, at 225 (Tex.Cr.App.1988). That a killing was "senseless, unnecessary and cold-blooded" does not invariably justify affirmative answer to the second special issue. *Keeton v. State*, 724 S.W.2d 58, 63–64 (Tex.Cr.App.1987).

The State produced no opinion testimony, psychiatric or otherwise, that appellant would likely commit acts of violence in the future. Nor did the State show any past criminal record, history of violent or even nonviolent unadjudicated misconduct, or bad reputation for peaceableness. School records indicated appellant's I.Q. tested at "less than 70," and that he achieved only "social" promotions. A face scarred by a dog bite, and unreliable bowel control well into adolescence caused appellant much em-

barrassment among his peers. Nevertheless, though other children at school "abused" and "picked on" him, appellant would leave campus rather than resort to conflict. Witnesses for both the prosecution and the defense unwaveringly characterized him as nonviolent, with adjectives such as "mild mannered," and even "gentle." Appellant was considered a "hero" by the local office of the Texas Employment Commission because on one occasion he subdued a man there who was in the process of assaulting one of its employees.

The question is whether the evidence supports a rational conclusion there is a "probability" appellant will continue to commit criminal acts of violence in the future. Article 38.071(b)(2), supra. We have said that "probability" is to be taken and understood in its usual acceptation—the generally understood meaning—in common language. *Cuevas v. State*, 742 S.W.2d 331, 346 (Tex.Cr.App.1987). We know that the second special issue calls for proof of more than a bare chance of future violence. See *Jurek v. State*, supra (Odom, J, concurring in part and dissenting in part) (Roberts, J., dissenting). In *Cuevas v. State*, supra at 347, we observed:

> "Dictionary definitions of 'probability' include: 'likelihood; appearance of reality or truth; reasonable ground of presumption; verisimilitude; consonance to reason.... A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it.' *Black's Law Dictionary* 1081 (5th ed. 1979); 'Something that is probable,' with 'probable' meaning 'supported by evidence strong enough to establish presumption but not proof; likely to be or become true or real.' *Webster's New Collegiate Dictionary* (1980)."

Considering the uncontested testimony of appellant's nonviolent character, we cannot say that the inferences urged upon us by the State are adequate to persuade a rational jury of a "probability" appellant would commit future acts of violence.

Viewing all of the evidence in the light most favorable to the verdict, we hold it to

be insufficient to support an affirmative response to the second special issue. *Huffman v. State*, supra; *Keeton v. State*, supra. Appellant's fourth point of error is sustained. Analysis of appellant's points of error seven and eight, alleging constitutional defects inhering in Article 37.071, supra, is therefore pretermitted. *Sanne v. State*, 609 S.W.2d 762, 767 (Tex.Cr.App. 1980). We next consider appellant's points raising purported error at the guilt/innocence phase of trial.

## II.

In his first three points of error appellant challenges admissibility of his written confession. He contends in point of error one that the confession resulted from continued questioning by police following his unheeded invocation of right to counsel, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In points of error two and three, appellant claims his confession was taken involuntarily in that, respectively, it came as a result of a promise of a benefit, and was a product of extended interrogation, appellant's limited intelligence, and deprivation of food and sleep. After reviewing the events of November 8, 1984, the day appellant's confession was taken, as developed at the *Jackson v. Denno*[1] hearing, we will treat these contentions *seriatim*.

Police detectives investigating Shalyn Cowans' death had no solid leads, and, because the scene showed no physical manifestations of forced entry, were concentrating their efforts on persons who might have had access to the duplex. In the course of their investigation they spoke with appellant's wife, who was secretary for Lester Humphrey Pest Control. Ascertaining that appellant had recently sprayed the Cowans' residence, they requested she ask appellant to contact them for routine questioning. Appellant was not a suspect at this time.

On the night of November 7, 1984, appellant's wife alerted him that detectives wanted to talk to him. Appellant proceeded to work his night shift as a taxicab driver, and then, the next morning at 8:00 a.m., without having slept, he presented himself at the police station. Detectives Hudgens and Lincecum escorted appellant into an office, where they were soon joined by Detective Goolsby. The officers informed appellant of their investigation into Shalyn Cowans' murder. Appellant responded, "Let me tell you what happened." He then recounted a brief story of letting himself into an apartment to exterminate and discovering "a nude woman laying on the bed with a gun beside her." This account jibed in certain respects with details of the murder scene. After consulting among themselves, the officers decided they should read appellant his *Miranda* warnings, and Hudgens did so at 8:10 a.m. Appellant acknowledged he understood them, and was allowed to read the warning card himself. He thereafter agreed to talk to the detectives, and questioning began in an effort to find out whether appellant was in fact describing the Cowans' residence as it appeared on the day of the murder. Appellant admitted to no involvement in Shalyn's death.[2] At some point Lincecum

---

1. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

2. During this questioning appellant told the detectives, variously, that the day he had been in the duplex was October 4, October 25, and the day of the murder, October 26, 1984. At appellant's direction, Hudgens was able to sketch a floorplan which approximated the Cowans' duplex, and gave an accurate location of a couch, a baby bed, and the bed on which Shalyn's body was found. At one point Lincecum showed appellant an array of photographs of the duplex as it appeared on October 25, and he recognized a number of details. Other aspects of his original story, however, were not consistent with the murder scene. For example, appellant believed he had seen the "nude woman" at a two story apartment complex. He maintained the headboard of the bed he saw her on was made of oak. Only after prompting by the detectives did appellant remember the headboard was brass, as was Shalyn's. Not until viewing the picture of Shalyn on the bed did appellant remember the woman he had seen had not been completely naked, as he had first related. Furthermore, no gun was found next to Shalyn's body. Curiously, at trial it was revealed that Sandra Wymore, the Cowans' next-door neighbor, sometimes napped in the afternoon, naked from the

asked appellant whether he "want[ed] to stay here today and get all this completed, or what do you want to do?" Appellant responded that he could stay until 4:30 p.m., at which time he would have to go to work.

At 10:16 a.m. appellant signed a consent form to search his apartment. On the way there the officers asked appellant if he could show them where he had seen the "nude woman." When appellant seemed unsure, they proceeded to drive by the Cowans' duplex. Appellant informed them, "That's it." He then walked them through the residence, describing what he had seen there before.[3] Later, during the drive either to his apartment or back to the police station, it apparently dawned on appellant that he was under suspicion, for he asked, "Y'all don't think I did this, do you?" In the ensuing discussion it was suggested that the detectives "might ask [appellant] to take a polygraph later in the day." Back at the station, Lincecum accompanied appellant to the restroom. Here appellant told Lincecum that polygraph examinations made him nervous, and that he had once failed one for that reason. While not refusing to take the test, he wanted Lincecum to know his nerves "might affect it."

At 12:15 p.m., Detectives Hudgens and Goolsby resumed questioning appellant. For the first time they began to accuse him of lying in his denial of any knowledge of the circumstances of Shalyn's death. Hudgens testified:

"A. ... And we continued questioning him for about fifteen minutes, and he asked for his attorney.

Q. Okay. And what did you do at that point in time, when he said he wanted to speak to his attorney?

A. Stopped talking to him and made a telephone available for him.

Q. What time did you conclude the interview with him, when he requested to talk to his attorney?

A. About 12:30 p.m.

Q. What did you do?

A. Made a telephone and a telephone directory available. * * * Stepped out of the room, left the door open, where I could watch him. And he made a couple of phone calls.

Q. Could you hear his conversation?

A. No, I couldn't.

Q. How long was he on the telephone?

A. Probably five minutes, ten minutes.

Q. And he had the telephone directory available to him?

A. Yes.

Q. After he concluded his two telephone calls, what did you do?

A. I stepped back in the room and asked him if he had contacted his attorney, and he told me that he had. The attorney told him to take the polygraph and to call him back later.

Q. Okay. Did he at that point in time indicate to you that he wanted to terminate any interview with you and the other officers concerning this investigation?

A. No.

Q. Did he express a desire to be examined by polygraph, is that correct?

A. Yes."

Hudgens later testified he had not asked appellant what his attorney had told him before appellant volunteered, "My attorney told me to take the polygraph and then call him back." Detective Goolsby testified likewise.

The attorney appellant called was Goodwin Hale, who had known appellant for twenty years but had never represented him. As to the substance of appellant's call, Hale related:

---

waist down, with a gun beside her on the bed. Her headboard was made of oak!

3. Although the duplex was vacant at this time, appellant purported to remember such details as: a Taco Bell cup on a ledge near the front door; a red diaper bag on the couch; a mustard jar and knife out on a counter. All of these

details were consistent with the duplex as it appeared on the afternoon of October 26, 1984, when Shalyn was killed. It is unclear how much of appellant's memory was prompted by the photographs shown to him before the tour of the duplex, but the cup, diaper bag and mustard jar all appear in the photographs.

"Q. ... Okay. And can you state briefly what Sammie told you on the phone? A. Briefly, he indicated to me that he was in the City of Lubbock police station, and that they were asking him questions—in his words, he said, 'They are asking me questions about something that I don't know anything about.' And he said, 'I'm fixing to take a polygraph test, a lie detector test, and I wanted to know what you thought about it.' And I said, 'Sammie, I don't know enough about the situation to have an opinion. I don't know what you're talking about.' And he said, 'Well, they're talking to me about a murder, and I'm fixing to take a polygraph test right now.' In fact, he said, 'They are coming back into the room now. I've got to hang up. I'm fixing to take the test.' I said, 'All I can tell you at this point, Sammie, is that you do not have to take it if you don't want to take it.' He said, 'I want to take it.' "

When Hale asked appellant whether he wanted Hale to come to the station, appellant answered, "No, not now. I'm going to take the test. I may need you later." Appellant himself testified:

"Q. Okay. Tell me about your conversation with Goodwin Hale, Sammie.

A. I talked to him on the phone, and I told him at that time where I was, and I told him I wanted to take a polygraph test, and I was asking his advice on whether I should or not, and ...

Q. Do you remember what he told you?

A. He said that was up to me.

Q. Did you tell him you did want to take the polygraph test?

A. I did.

Q. Did you, in fact, want to take the polygraph test?

A. Yes.

Q. Did you see that as a way to prove your innocence?

A. Yes, I did.

Q. Did he tell you to call him back?

A. Yes, later on that afternoon.

Q. Did you intend to call him back after you took the polygraph test?

A. Yes, I did."

Without further interrogation, the detectives took appellant to the polygraph room.

At 1:30 p.m., Detective Hargrave, the polygraph operator, entered the room and immediately informed appellant of his *Miranda* rights. Appellant signed a form indicating he had been warned of and understood these rights, and verifying he was "taking this polygraph examination voluntarily." Hargrave commenced to question appellant in order to obtain a consistent story from which to fashion questions that could be answered "yes" or "no" for purposes of the polygraph examination. Apparently appellant vacillated as to the date he was in the Cowans' duplex. See n. 1, *ante.* With each retelling of the story appellant "would change certain things." Over the next two hours Hargrave continued to question appellant. Early on he asked appellant point blank whether he had killed Shalyn. Appellant denied it. There is testimony that at least once Hargrave told appellant, "I can't help you if you are not going to be truthful about the whole thing," or, alternatively, "I can't help you if you're not going to help yourself." Hargrave himself admitted he said "words to that effect." Throughout the interrogation he accused appellant of being a "liar." Eventually appellant admitted to the killing, and at 3:30 p.m. he agreed to give a written statement. Following a short break, and further *Miranda* warnings, he did so. Appellant did not request the presence of his attorney at this time. He signed the statement at 4:15 p.m. Hargrave never administered the polygraph examination.

After giving the statement, appellant was allowed to leave the station, but several officers tailed him. A short while later he was arrested in his home pursuant to a warrant.

The detectives uniformly maintained appellant appeared to be of average intelligence. Although they had been aware appellant had not slept the previous night, he did not appear tired to them. Appellant presented the testimony of a psychiatrist, Dr. Alex Munson, who examined appellant on the afternoon of January 16, 1985.

Munson's testing indicated appellant fell "in what we now classify as the borderline range of intelligence." Munson testified further:

"Q. Dr. Munson, you were asked specifically to examine [appellant] as far as how stress might affect him. Is that one of the things that you looked into?

A. Yes.

\* \* \* \* \* \*

Q. Do you have an opinion regarding [appellant] as to the voluntariness of his waiver of rights and the statement that was taken by the police?

A. It would be my opinion that his statement to me of stress and a desire to, I recall—I believe his words were, 'to sign anything to get out,' with, again assuming the history he provided me was accurate of having been up the night before working, and having been in interrogation of one sort or another during the day, is certainly compatible with his mental status of an individual with limited resources who is subject to influence from persons that he sees as being dominant or in an authoritarian role. \* \* \*

Q. Would it be compatible with your examination that his confession was not given freely and was not the product of a knowing and intelligent waiver of his legal rights?

A. It would be."

Appellant himself testified that he had been "scared," "sleepy" and "confused," and that he would not have continued talking to the detectives had he known they would not ultimately give him the polygraph test. Acknowledging that he was warned of his constitutional rights, appellant maintained, "I didn't understand anything that was—just almost anything that was going on." He testified that he had not really understood what he had signed. The attorney initially assigned to represent him testified that when she spoke to appellant the night of his arrest, "[h]e was nervous, distraught, confused, [and] made inappropriate answers" which indicated he did not truly understand "what was going on

around him" or the severity of the charge against him; "all he was doing was parroting the legal phrases that I had given him."

Pursuant to Article 38.22, § 6, V.A.C.C.P., the trial court entered an order in which it concluded: that appellant was not coerced into giving his statement "by any ... promises nor by any psychological coercion or persuasion, nor by any other improper influence[;]" that appellant "had ... the mental capacity to understand the warnings given him and to intelligently, knowingly and voluntarily waive the rights explained to him and he did understand such warnings, and affirmatively waived the rights, freely, knowingly, voluntarily and intelligently[;]" and that appellant "was not denied the right of counsel." The trial court seems to have taken for granted that appellant was in custody throughout. *Arguendo*, we will assume as much.

"[A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. The analysis is two-fold. First it must be determined whether the accused actually invoked his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). This Court measures whether an accused has invoked his right to counsel by the totality of the circumstances. *Collins v. State*, 727 S.W.2d 565, 568 (Tex.Cr.App.1987). While further questioning may be permitted for the limited purpose of clarifying an equivocal invocation of the right to counsel, *Massengale v. State*, 710 S.W.2d 594, 598, n. 2 (Tex.Cr.App.1986), where invocation is clear "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. at 100, 105 S.Ct. at 495, 83 L.Ed.2d at 496.[4] A request for counsel that is ambiguous in scope will be afforded

---

4. Emphasis in the original.

"a broad rather than a narrow, interpretation." *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920, 928 (1987), quoting *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631, 640 (1986).

Second, once it is found the accused invoked his right to counsel, "courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois,* 469 U.S. at 95, 105 S.Ct. at 493, 83 L.Ed.2d at 494. See also *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (Plurality Opinion). The trial court drew no specific conclusions regarding whether appellant invoked counsel, or, if so, whether he subsequently waived the right after first renewing communications with the detectives. In our view, however, the trial court did not err to conclude appellant was not deprived of his right to counsel.

■ Fifteen minutes after the detectives first began to accuse him of lying to them about his knowledge of Shalyn's murder, by which time it had become clear to appellant that he was the object of their suspicions, "he asked for his attorney." The State argues this was a limited invocation of counsel, only for the purpose of deciding whether to submit to the polygraph examination, and that this limited invocation was fully honored before any additional interrogation occurred. See *Griffin v. Lynaugh,* 823 F.2d 856 (CA5 1987). But that conclusion depends upon consideration of events shown to have transpired after appellant's initial request, which appears on its face to have been manifestly unequivocal. Such an analysis would fly in the face of the Supreme Court's holding in *Smith v. Illinois,* supra. Instead, giving a broad construction to appellant's simple request for "his attorney," *Connecticut v. Barrett,* supra, and judging from the totality of circumstances as they existed at that point in time, *Collins v. State,* supra, we conclude appellant invoked his right to the presence of counsel before further questioning.

■ We do look to subsequent events, however, to determine whether, having invoked that right, appellant subsequently renounced it. From the conversation appellant had with Hale it is clear that the purpose of the call was to obtain counsel's advice as to whether he should submit to the polygraph. Aware that he did not have to, appellant told his attorney, "I want to take it." Apparently satisfied with this consultation, he expressly declined to have Hale come down to the station. We are not inclined to construe Detective Hudgens' question whether appellant had contacted his attorney as a resumption of interrogation or as an artifice to trick or cajole appellant into relinquishing his right. The trial court as factfinder at the *Jackson v. Denno* hearing could easily have determined that Hudgens' question represented no more than a simple attempt to ascertain whether appellant had been able to implement the right he had invoked;[5] and that it was appellant who initiated further communications by volunteering he would take the

---

5. At trial Detective Goolsby testified Hudgens asked appellant not only whether he had contacted his attorney, but also, "What did he say?" Appellant contends Hudgens thereby re-instigated the dialogue. We need not decide whether this additional inquiry, if it did occur, would change the tenor of our analysis. Both parties were given an opportunity at trial to adduce further evidence pertaining to appellant's pretrial motion to suppress his confession, and both declined. The specific question whether Detective Hudgens re-initiated communications was not an issue *per se* outside the context of the pretrial hearing. See *Hardesty v. State,* 667 S.W.2d 130, at 133, n. 6 (Tex.Cr.App.1984). Assuming it reconsidered its ruling on appellant's pretrial motion in light of Goolsby's trial testi-

mony, see *Webb v. State,* 760 S.W.2d 263, at 272, n. 13 (Tex.Cr.App.1988), the trial court as factfinder was entitled to resolve the conflict in evidence by accepting Hudgens' testimony at the *Jackson v. Denno* hearing that he simply asked appellant whether he had contacted his attorney, and nothing more. *Collins v. State,* supra, at 567; *Freeman v. State,* 723 S.W.2d 727, 733 (Tex.Cr.App.1986).

In any event, in *Massengale v. State,* supra, at 598, we observed: "One ... brief encounter with an attorney does not, of course, waive the right to further assistance of counsel. [citation omitted.] But police were entitled to inquire if appellant, having met with an attorney and dismissed him, was now willing to be questioned without an attorney present."

polygraph examination and call his attorney back later. He was not questioned again until Hargrave arrived and advised him again, *inter alia*, of his right to have an attorney present. He was cautioned yet a third time before his statement was reduced to writing. Under these circumstances, especially considering his express determinedness to take the polygraph examination, we cannot say the trial court erred to conclude appellant knowingly and intelligently waived his right to counsel. *Smith v. Illinois*, and *Oregon v. Bradshaw*, both supra; *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Appellant's first point of error is overruled.

In his second and third points of error appellant does not assail voluntariness of his waiver of his Fifth Amendment privilege against self-incrimination. Rather, as we understand it, he invokes voluntariness as a function of the due process and due course of law clauses. See *Griffin v. State*, 765 S.W.2d 422, 429, n. 11 (Tex.Cr. App.1989). At least as a matter of federal law, we must focus on official coercion as it impacts the free will of the accused. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The issue is whether police interrogation techniques alleged to have been coercive, either physically or psychologically, were of such a nature that any confession thereby obtained was unlikely to have been the product of a rational intellect and a free will. *Griffin v. State*, supra, and cases cited at 428. Appellant also cites caselaw implicating nonconstitutional doctrines of state law designed to insure reliability of confessions. "Voluntariness" under both constitutional and state law doctrines is to be measured according to the totality of the circumstances. *Griffin v. State*, supra, and cases cited at 427; *Thomas v. State* 35 Tex.Cr.R. 178, 32 S.W. 771 (1895).

▇▇▇ In point of error two appellant contends Detective Hargrave induced his written confession with two promises of benefit. First, appellant maintains he confessed on the strength of Hargrave's representations that he could not "help" appellant without his cooperation. Appellant likens this to a faulty warning that the statement of an accused can be used "for or against" him in his prosecution. E.g., *McVeigh v. State*, 43 Tex.Cr.R. 17, 62 S.W. 757 (1901). Second, appellant gave the statement only on the understanding that he would be examined on the polygraph. Under state law a promise will render a confession "involuntary" if it: (1) is of some benefit to the accused; (2) is positive; (3) is made or sanctioned by a person in authority; and (4) is of such a character as would likely influence the accused to speak untruthfully. *Washington v. State*, 582 S.W.2d 122, 124 (Tex.Cr.App.1979).

Appellant admitted he desired to take the polygraph examination "as a way to prove his innocence." Hargrave's testimony indicates he had difficulty obtaining a consistent story from appellant for purposes of administering the test. The trial court could have interpreted Hargrave's statement as an entreaty that appellant "help" him to formulate questions by rendering a consistent account so that the polygraph would be available to "help" appellant in his own effort "to prove his innocence." Thus construed, Hargrave's statement is not comparable to an initial warning that an accused's confession may be used "for" him. It offered no greater inducement than that already contemplated by appellant in agreeing to take the polygraph. It was not necessarily a promise at all, much less a "positive" promise. *Thompson v. State*, 19 Tex.App. 616 (1885). That the purported need for a consistent story may have been a pretext on Hargrave's part is a scenario the trial court obviously rejected, and, although *dubitante*, we cannot say the court thereby abused its discretion. *Hawkins v. State*, 613 S.W.2d 720, 731–32 (Tex.Cr.App.).

As for appellant's second contention under this point, we fail to perceive in what way a "promise" of a polygraph, without more, would operate to induce an accused falsely to *inculpate* himself. An accused willing to submit to the test either: believes that he is innocent and will pass it; hopes that he can beat it; fears that authorities will draw an inference of his guilt

if he refuses; or, least likely, simply does not care that his deception is exposed. It stretches credulity to believe, however, that he would falsely incriminate himself in the hope that the polygraph would then vindicate him. Whatever motive appellant may have had to admit the killing, on the facts of this case we fail to see how the promise of a polygraph alone would have "inclined [appellant] to admit a crime he had not committed." *Washington v. State,* supra, at 124, quoting *Fisher v. State,* 379 S.W.2d 900, at 902 (Tex.Cr.App.1964).[6] It does not appear that "the influence applied was such as to make [appellant] believe his condition would be bettered by making a confession, true or false[.]" *Id.* The trial court could have found that any promise made to appellant that he could take the polygraph exam did not meet the fourth prong of the test enumerated in *Washington v. State,* supra.

In the written confession itself appellant endorses the statement, "I have not had any promises made to me before this statement by the officers who are talking to me." Under the circumstances the trial court was justified in concluding, at any rate, that no promises were made sufficient in themselves to overcome his free will. Appellant's second point of error is overruled.

The question remains, as raised by appellant's third point of error, whether all the circumstances were sufficient to render appellant's written confession involuntary. Appellant points to the factors Dr. Munson found "compatible" with the conclusion he did not freely choose to confess, *viz:* his mental deficiency and resultant deference to authority; the fact he was questioned more or less continuously for eight hours without having slept the night before, and without being fed; and repeated attacks on his veracity. We also note appellant's own testimony, echoed by that of his earliest appointed attorney, to the effect he was confused and had understood neither the rights that were related to him nor the gravity of his situation. Evidence militating in favor of the trial court's finding of voluntariness includes appellant's desire to take the polygraph, his expressed willingness to stay through the afternoon despite his lack of sustenance, and the fact he did not appear to the officers to have been tired or uncomprehending. His interrogation did not occur incommunicado. He was *Mirandized* three times and each time acknowledged that he understood. He actually consulted with counsel, declined his presence, but was free at all times to summon him. Balancing these factors, the trial court concluded that appellant's will was not unconstitutionally overborne by police coercion.[7] Although the question is a close

6. In *Washington v. State,* supra, the panel identified the "benefit" of the promise there as twofold: "The direct benefit promised was that which appellant requested: the opportunity to take a polygraph test. The potential benefit was possible discharge if he was found to be truthful during the examination." *Id.,* at 124. However: "He was also promised that if he told the truth on that examination, then any confession or 'stipulation' he made in court [pursuant to a guilty plea] would be disregarded and his conviction would be set aside. Under those circumstances a person intending to tell the truth on the exam would have nothing to lose by confessing, but would have the possibility of the ultimate gain of having the charges dismissed. * * * Appellant ... faced a situation in which a truthful polygraph examination would result in no worse of a position for himself than prior to the confession, but could potentially secure his release. Such circumstances would very likely amount to an irresistible pressure to sign a confession even though the defendant is innocent."

*Id.* In the instant case no positive promise was made to appellant of any benefit he might reap from passing the polygraph. There is no *quid pro quo* for appellant's confession as there existed in *Washington.* Under the circumstances of this case we cannot hold, as in *Washington,* that the promise of the polygraph rendered appellant's confession "inadmissible as a matter of law." *Id.,* at 123.

7. The reasoning of *Jackson v. Denno,* supra, notwithstanding, we give some weight as well to the fact that the jury, upon substantially the same evidence adduced at trial, and charged to disregard appellant's confession if it found that the prolonged questioning without food and sleep "amounted to such compulsion or persuasion as to render his statement not wholly voluntary," concluded likewise that appellant's confession was freely given. For surely, without the confession, the evidence to convict in this cause was insufficient to support a rational finding of guilt.

one in light of appellant's limited intelligence, that factor alone does not mandate a finding of involuntariness. *Colorado v. Connelly,* supra.[8] The level of physical deprivation presented is not so appalling as to call for exclusion of the confession as a matter of law, even considering appellant's retardation. The record supports the trial court's conclusion, and we will not disturb it on appeal. See *Jurek v. State,* 522 S.W.2d at 943. Appellant's third point of error is also, therefore, overruled.

Appellant's fifth point of error contends the trial court erred in "repeatedly admitting hearsay testimony as long as [appellant] was present when the statements were made." Within this point appellant alludes to "hours of hearsay testimony[.]" From this "hours" of testimony appellant specifically directs our attention to only two instances.

■ First he complains that Detective Goolsby was permitted to testify at trial that after appellant had talked to counselor Hale on the telephone, Detective Hudgens had asked him, "Did you get in contact with your attorney?" In our view it is enough to dispose of this contention to observe that Goolsby's testimony entailed no assertion by an out of court declarant, but merely related the content of the question Hudgens asked appellant. Goolsby was present when Hudgens asked the question, and so was in a position to relate firsthand its substance. His testimony was not hearsay. Appellant did not object to relevancy of the substance of Hudgens' question, and we perceive no error in admitting it.

■ Appellant's second complaint pertains to testimony of a statement made by his wife at the time of his arrest in their home. Detective Lincecum testified appellant appeared "depressed" at this time:

"Q. Did you notice anything about Mrs. Smith at the point in time when he was placed under arrest?

A. She was very upset.

Q. Who did she appear to be upset with?

A. Mr. Smith.

Q. Did she ever express anything to you or any of the other officers that she was mad at you or the police officers?"

Appellant interposed a hearsay objection, which was overruled by the trial court on the rationale that the statement the State sought to adduce "was made by the wife to a third party in the presence of [appellant]." The prosecutor then resumed:

"Q. What did Mrs. Smith state to you and the other officers in the presence of [appellant] at the point in time when he was placed under arrest?

A. She didn't state anything to me.

Q. Did you hear her say anything?

A. Yes, I did.

Q. What did you hear her say?

A. I don't remember her exact words, but it was to the effect of 'I'm tired of this, Sammie, I have had all of this I can take.'

Q. Nothing was said to you or any other officers?

A. No.

Q. Derogatorily toward you or the police?

A. No."

The State argued at trial, and reiterates on appeal, that admission of this statement of appellant's wife is authorized by V.T.C.A. Penal Code, § 19.06, as proof of the deteriorated state of appellant's marriage bearing upon "the condition of the mind of the accused at the time of the offense." Appellant counters that § 19.06, supra, does not operate to extend the rules of evidence to admit otherwise objectionable hearsay

---

8. This Court has found mental deficiency at least as severe as appellant's to be a factor, but not alone determinative, in ascertaining voluntariness both of the accused's confession itself, under due process analysis, *Casias v. State,* 452 S.W.2d 483 (Tex.Cr.App.1970), and of waiver of his Fifth Amendment privilege against self in-

crimination, *Grayson v. State,* 438 S.W.2d 553 (Tex.Cr.App.1969); *Bizzarri v. State,* 492 S.W.2d 944 (Tex.Cr.App.1973); *White v. State,* 591 S.W.2d 851 (Tex.Cr.App.1979). The two inquiries are essentially the same. *Griffin v. State,* supra, at 429.

testimony. E.g., *Fazzino v. State*, 531 S.W.2d 818 (Tex.Cr.App.1976). It occurs to us that the statement, if indeed "relevant" in contemplation of § 19.06, supra, may well have been admissible as an exception to the hearsay rule, falling in the category of declaration of a present state of mind. See R.Ray, 1A Texas Practice: Law of Evidence § 862 (3rd ed. 1980).[9] As proponent of the evidence, however, the State did not invoke this exception.

At any rate, assuming, without deciding, that it was error to admit the statement, we find it to have been harmless beyond a reasonable doubt. By the time the statement was elicited the jury had already heard Lincecum's testimony, *sans* objection, that upon appellant's arrest his wife seemed disaffected with him rather than angry with police. That she was "tired" of the situation, whatever it was, and had "had all of" it she could take, was but an elaboration of the fact, already before the jury, that she was "upset" with appellant. The prosecutor made no allusion to the incident in his final arguments. Whatever purpose the State's evidence was intended to serve, we fail to see how admission of Mrs. Smith's precise words could have made any incremental contribution the jury's verdict either at guilt or punishment. Tex.R.App.Pro., Rule 81(b)(2). Appellant's fifth point of error is overruled.

■ In his sixth and final point of error relating to the guilt/innocence phase of trial, appellant alleges the trial court erred in allowing the testimony of Martin Cardenas, a T.D.C. inmate. Cardenas' testimony should have been excluded, appellant asserts, because the State failed to comply with a discovery motion, granted by the trial court, requiring disclosure of any con-

sideration afforded by the State in exchange for testimony of a witness.

Prior to trial appellant filed a motion for discovery requesting, *inter alia*, information regarding "anything ... which arguably could be of value or use to a witness ... including ... recommendations or other assistance with respect to ... parole" offered in exchange for any witness' testimony. Appellant apparently anticipated testimony from both Cardenas and another inmate, Moses Morales. At the hearing on the discovery motion the prosecutor effectively denied "any agreement that was made with them as far as any consideration of their sentence with regard to any testimony they might give in this case." Prior to Cardenas' testimony at trial, appellant took him on voir dire in an attempt to ascertain whether he had been offered any inducement to testify. During cross voir dire the District Attorney revealed that the previous week, subsequent to the hearing on the discovery motion, he agreed to "write a letter to the Board of Pardons and Paroles as far as [Cardenas] testifying in this trial[.]"[10] On this representation appellant objected to having Cardenas testify at all, claiming surprise because of violation of the discovery order. The objection was overruled.

Accordingly, Cardenas testified he had shared a cellblock with appellant in the Lubbock County Jail. At that time he knew of the charge against appellant from television reports, but appellant had denied it. On November 23, 1984, Cardenas and Morales were in the visiting area when they overheard appellant tell a visitor, apparently his wife, "that he was sorry that he had killed that woman, and that he don't know why he done it[.]"[11] Because he had

---

9. Appellant was tried in March of 1985, before the effective date of the Rules of Criminal Evidence. Thus, Tex.R.Cr.Evid., Rule 803(3), does not apply.

10. Former Lubbock County District Attorney, Jim Bob Darnell, prosecuted appellant's case himself.

11. On cross-examination appellant's counsel asked Cardenas whether it was possible appellant had actually said, "I don't know why *I confessed* to killing that girl." (Emphasis sup-

plied.) The question appears to have thoroughly confounded Cardenas, and it was ultimately revealed that, English being his second language:

"Q. You don't know what the word 'confess' means, do you?
A. That's why I'm asking you."
Of course, the weight to be given Cardenas' testimony is a question wholly for the jury as factfinder.

lied to them, Cardenas and Morales then beat up appellant, opening a wound in his head.

At the conclusion of Cardenas's testimony appellant again objected, specifically requesting some form of sanction for violation of the discovery order. Expressly finding no bad faith on the part of the State, the trial court refused. Appellant now argues the trial court thus erred; that willful violation of a discovery order requires exclusion of the evidence withheld. See *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex.Cr.App.1978); *Lindley v. State*, 635 S.W.2d 541, 544 (Tex.Cr.App.1982). Of course appellant would not have us apply this rule literally. In both *Hollowell* and *Lindley* the evidence "withheld" contrary to ordered discovery was harmful to the defendant. Here, by contrast, that the District Attorney agreed to help Cardenas obtain parole in exchange for his testimony is a fact appellant hardly wanted excluded from the jury. In fact he fully developed it on cross-examination, along with the fact that Cardenas was never prosecuted for the beating he inflicted on appellant. Nevertheless, appellant complains he was denied the opportunity to "arrange testimony by witnesses who would have testified to the value of a letter from the District Attorney or would have testified to the unusual nature of the offer from a District Attorney who repeatedly and publicly opposed leniency in parole and in plea bargains and who regularly indicated that violent prisoners should suffer significant sanctions." Appellant neither proffered a particular witness to the trial court, however, nor requested a postponement or continuance to obtain one. Article 29.13, V.A. C.C.P. "This default alone would waive any error urged on the basis of surprise." *Rodriguez v. State*, 597 S.W.2d 917, 919 (Tex.Cr.App.1980) *vacated and remanded on other grounds*, 453 U.S. 906, 101 S.Ct. 3137, 69 L.Ed.2d 991 (1981). See also *Lindley v. State*, supra. In any event, having successfully impeached Cardenas by exposing his possible motive to testify against him, appellant was not denied a fair trial. We see no justification for wholesale exclusion of Cardenas' testimony, and overrule appellant's sixth point of error as well.

### III.

Holding the evidence insufficient to support affirmative answer to the second special issue under Article 37.071(b), supra, we reform the judgment to reflect punishment at life imprisonment. *Keeton v. State*, supra. As reformed, the judgment is affirmed.

TEAGUE, J., concurs in the result.

CAMPBELL, WHITE and BERCHELMANN, JJ., dissent.