

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-75,749

**DEXTER DARNELL JOHNSON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 1085483 IN THE 208TH DISTRICT COURT HARRIS COUNTY

**JOHNSON, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Appellant was convicted in June 2007 of capital murder. TEX. PENAL CODE ANN. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h).

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

Appellant raises five points of error. Points of error one and two do not challenge the conviction or sentence; rather, they concern the trial court's failure to make findings of fact and conclusions of law as to its denial of appellant's pre-trial motions to suppress his statements to police. The trial court has now supplemented the record with findings and conclusions. Therefore, points of error one and two are moot. After reviewing appellant's three remaining points of error, we find them to be without merit and affirm the trial court's judgment and sentence of death.

### Statement of Facts

Appellant was charged with intentionally causing the death of Maria Aparece during the course of robbery. The evidence showed that in the early morning hours of Sunday, June 18, 2006, appellant, Ashley Ervin (Ashley), Louis Ervin (Louis), Keithron Fields, and Timothy Randle were riding around in Ashley's black Nissan Sentra, looking for someone to rob. They eventually came upon Aparece and her boyfriend, Huy Ngo, sitting inside Aparece's blue Toyota Matrix,[2] which was parked down the street from Ngo's house. Holding a shotgun, appellant stood outside the driver's door and threatened to shoot Aparece through the window if she did not open the door. When she complied, he threw her into the back seat of the Matrix, while Fields, who had been standing outside the passenger's door, did the same with Ngo. Louis climbed in next to Aparece and Ngo, appellant climbed into the driver's seat, and Fields climbed into the front passenger seat. Appellant then drove around, demanding money from Aparece and Ngo. Ashley and Randle followed in the Sentra. Eventually, both vehicles stopped near a wooded area. Fields forced Ngo out of the car. Appellant then raped Aparece in the car while Fields held a gun to Ngo's head and taunted him about what

___

[2] Aparece was a college student who lived with her parents. The Matrix was registered to Aparece's father, who had bought it for her use.

appellant was doing to his girlfriend. Appellant and Fields then marched Aparece and Ngo into the woods and shot them each in the head.

Appellant and Fields took the Matrix back to their apartment while the Ervins and Randle followed in the Sentra. On the way, they stopped at a gas station and used Aparece's credit card to buy gas for both vehicles. In the following days, appellant used Aparece's credit card to make additional purchases.

Appellant, the Ervins, and Fields were staying with Fields's mother, Felicia Williams, at her apartment in Humble. Two days later, on the night of June 20, Williams called the Humble Police Department about three suspicious vehicles that were parked in the parking lot of her apartment complex. Officers Clint Ward and Joe Martinez responded to the call. They discovered that the vehicles, including a blue Matrix, had been reported as stolen.[3] They impounded all three vehicles.

In the early morning hours of June 21, Officers Thomas Hudson and Victor Gonzales were dispatched to the residence of a mother who had called the Humble Police Department to report that her fourteen-year-old daughter had run away or was out past curfew without parental consent. By the time they reached the residence, the daughter had returned home. The officers determined from speaking with the daughter that she had been with appellant at Williams's apartment. They then went to Williams's apartment to speak with appellant.

When the officers approached Williams's apartment, they could smell an odor of burning marijuana. They knocked on the door, which was opened by Williams. They noticed that the odor grew stronger after the door was opened, and they could see smoke inside the apartment. They asked to speak with appellant and were admitted into the apartment. Williams called appellant to come

---

[3] That same night, Aparece's father reported her disappearance to the Sugar Land Police Department.

downstairs, and he complied. While the officers were standing inside, they observed an ashtray with burned marijuana cigarettes in it. They discovered an additional marijuana cigarette in another ashtray and a baggie of marijuana on top of a night stand, as well as a shotgun under one of the beds. Appellant informed the officers that all of the marijuana and the shotgun were his. The officers arrested him for marijuana possession and seized the marijuana. They also took the shotgun because Williams told them she did not want it in her house.

After Aparece's father reported her disappearance to the Sugar Land Police Department, the Fort Bend County Sheriff's Department was called in to investigate, and on June 21, Detective Everett Hargrave was assigned to handle the investigation. He then became aware that Aparece's blue Matrix had been recovered in Humble. He called Aparece's father, who told him that, after Aparece disappeared, her credit card had been used to make purchases at Wal-Mart stores in Humble and Porter, that Aparece was last seen driving the family's blue Toyota Matrix, and that she had gone to visit Ngo. Ngo's family told Hargrave that Ngo was also missing. Hargrave went to the Wal-Mart in Humble, where he reviewed purchase records and watched surveillance videos. He was able to confirm that two black males had used Aparece's credit card to make purchases.

Hargrave also learned that the Humble Police Department had appellant in custody on drug charges, and that appellant was connected to the person who had reported Aparece's Matrix as a suspicious vehicle, so he drove to the Humble police station to question appellant. During the interrogation, which was recorded,[4] Hargrave was accompanied by his partner, Detective Bruce Campbell, and Detective Duke Caruthers of the Humble Police Department. Appellant initially told

---

[4] The DVD that was played for the jury depicted only the first hour and 28 minutes of this four-hour interrogation.

Hargrave that he had not robbed anybody, and he denied having any knowledge of stolen vehicles or Aparece.

After questioning appellant, Hargrave drove to the Wal-Mart in Porter, where he reviewed purchase records and watched surveillance videos and determined that two black males had used Aparece's credit card there as well. Hargrave then drove to the Ngo residence in Houston, where he spoke with Ngo's mother and brother. He also observed Ngo's packed luggage and Ngo's unused plane ticket to California, dated for June 20.

On June 22, Hargrave contacted the Harris County District Attorney's Office and, based on his information, it charged appellant with aggravated robbery. Appellant was transferred to the Harris County Jail that same day, and that evening, Hargrave met with detectives in the Houston Police Department's homicide division and gave them the results of his investigation.

On Friday, June 23, Officer Allen Brown of the Houston Police Department's homicide division helped execute an arrest warrant for Randle. Brown transported Randle to the homicide division and questioned him. About twenty minutes after he began questioning Randle, Brown suspended the interrogation so that Randle could show him the location of Aparece's and Ngo's bodies. Houston Police Detective Clement Abbondondalo accompanied them to the crime scene. After they located the bodies and returned to the homicide division, Brown resumed his questioning of Randle. Around that time, the Ervins were also arrested and questioned at the homicide division.

Around 8:00 p.m. that evening, appellant was transported from the Harris County Jail to the Houston Police Department's homicide division, where Abbondondalo questioned him. No interrogation rooms were available at that time. Therefore, Abbondondalo questioned appellant in an office, using a hand-held audio tape recorder to record the interrogation. Abbondondalo read

appellant his legal rights, and appellant acknowledged that he understood his rights and began talking even before he was questioned about the offense. Appellant admitted that he had driven the couple to a wooded area, where he had raped Aparece before he walked them into the woods. He denied shooting them, but he admitted that he had fired a gunshot near Ngo "just to scare them."

After they had been talking for about twenty minutes, Abbondondalo stepped out of the room. When Abbondondalo returned, appellant stated that he did not want to talk anymore. Abbondondalo immediately ended the interrogation.

### Appellant's Statement to Hargrave

In appellant's third point of error, he claims that the trial court erred in denying his motion to suppress his June 21 statement to Hargrave and overruling his objection that the State did not carry its burden to prove that he knowingly, intelligently, and voluntarily waived his Article 38.22, § 2(a) rights prior to and during the making of that statement. Appellant argues that his statement should have been suppressed because Hargrave admitted at the suppression hearing that appellant did not expressly waive his rights.

A trial court's ruling at a suppression hearing is reviewed for an abuse of discretion. *Rocha v. State,* 16 S.W.3d 1, 12 (Tex. Crim. App. 2000); *see also Ramos v. State,* 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). In reviewing the trial court's decision, an appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We afford almost total deference to a trial court's determination of historical facts. *Montanez v. State,* 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). We do not engage in our own factual review; we determine only whether the record supports the trial court's finding. *Rocha,* 16 S.W.3d at 12. We afford the same level of deference to the trial court's resolution of

mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review *de novo* the court's resolution of mixed questions not falling within this category. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos,* 245 S.W.3d at 418.

"[A] waiver [of] one's right to an attorney may be found in an express written or oral statement or may be inferred from actions and words of the person interrogated." *Barefield v. State,* 784 S.W.2d 38, 41 (Tex. Crim. App. 1989) (citing *Mays v. State,* 726 S.W.2d 937, 946 (Tex. Crim. App. 1986)). The oral-confession statute does not require an express verbal statement from an accused that he waives his rights prior to giving a statement. *Id.* at 40-41. Rather, the voluntariness of a confession is assessed by looking at the totality of the circumstances. *Id.*

Here, the trial court found that, before Hargrave questioned appellant, he properly admonished appellant of his Article 38.22, § 2(a) rights, and appellant implicitly waived these rights. The record supports this finding. The audiovisual recording of the interview reveals that each right was read to appellant, appellant verbally indicated that he understood each right, and he nodded his head in agreement after Hargrave finished reading the warnings out loud and asked him if he understood them. Hargrave then handed appellant the warning card from which he had been reading. Appellant wrote his initials next to each warning and signed a statement acknowledging that he understood his rights. Hargrave then began to question appellant in a conversational manner, and appellant's demeanor in responding was cooperative.

Our review of the audiovisual recording reveals that the circumstances in which appellant was questioned were not oppressive. Hargrave, Campbell, and Caruthers wore plain clothes and sat

in the same type of chair as appellant. Hargrave took notes, resting his papers and his writing arm on a table that was positioned between himself and appellant, while the other two detectives sat off to the side.

The record demonstrates that appellant voluntarily waived his rights prior to giving his statement. Therefore the trial court did not err in finding that appellant's statement to Hargrave was admissible under Article 38.22. Point of error three is overruled.

In point of error five, appellant asserts that the trial court erred in denying his requested Article 38.22 jury charge concerning his statement to Hargrave. He argues that Hargrave's acknowledgment that he did not expressly ask appellant whether he wished to waive his rights, and his admission that appellant never affirmatively stated that he wished to waive his rights, raised a fact issue as to whether appellant voluntarily waived his rights.

As noted previously, the oral confession statute does not require an express verbal statement from an accused that he waives his rights prior to giving the statement. *Barefield,* 784 S.W.2d at 40-41. Therefore, the absence of an express verbal statement does not raise a fact issue requiring a jury instruction. Point of error five is overruled.

**Appellant's Statement to Abbondondalo**

Point of error four states: "Appellant invoked his Fifth Amendment right to have an attorney present during his interrogation on June 21, 2006[,] by Detective Hargrave. He did not reinitiate contact with the police on June 23, 2006[,] and therefore Detective Abbondondalo illegally obtained his statement." Appellant claims that the trial court erred by denying his motion to suppress his June 23 statement to Abbondondalo and violated his Fifth Amendment rights by admitting it into evidence

over his objections.[5]

"An accused . . . having expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel is made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." *Etheridge v. State,* 903 S.W.2d 1, 17-18 (Tex. Crim. App. 1994) (quoting *Smith v. State,* 779 S.W.2d 417, 425 (Tex. Crim. App. 1989)(quoting *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981)). Whether the mention of a lawyer constitutes a clear invocation of the right to counsel depends on the statement itself and the totality of the surrounding circumstances. *State v. Gobert,* 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) (citing *Davis v. United States,* 512 U.S. 452, 459 (1994)). If the accused's invocation of the right to counsel is clear, his post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of his initial request. *Id.* at 893 (quoting *Smith v. Illinois,* 469 U.S. 91, 100 (1984)); *Smith v. State,* 779 S.W.2d 417, 426 (Tex. Crim. App. 1989). However, we do look to subsequent events to determine whether, having invoked the right to counsel, the accused subsequently renounced it. *Smith v. Illinois,* 469 U.S. at 98; *Smith v. State,* 779 S.W.2d at 426. Similarly, an accused's post-invocation statements that are not made in response to interrogation may create an ambiguity in an otherwise unambiguous invocation of the right to counsel. *See Muniz v. State,* 851 S.W.2d 238, 253 (Tex. Crim. App. 1993).

To initiate further communication, the accused must of his own volition convey to the police

---

[5] In his argument in support of this point, appellant briefly mentions that he invoked his right to remain silent during his statement to Hargrave, but his legal argument and his cited authorities address only the right to counsel. To the extent that appellant may have intended to argue that his statement to Abbondondalo was taken in violation of his right to remain silent, his argument is inadequately briefed. *See* TEX. R. APP. P. 38.1; *Cardenas v. State,* 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (appellate court has no obligation to consider inadequately briefed points of error). Although appellant briefly mentioned his right to silence in oral argument, he failed to argue it in his brief.

a willingness and a desire to talk about the investigation. *See, e.g., Cross v. State,* 144 S.W.3d 521, 525 (Tex. Crim. App. 2004); *see also Oregon v. Bradshaw,* 462 U.S. 1039, 1046 (1983). If he does so, then his previously invoked right may be knowingly and intelligently waived when he is informed again of his rights and states that he understands them. *Etheridge,* 903 SW.2d at 18.

Here, the trial court found that, during appellant's statement to Hargrave, appellant unambiguously invoked his right to counsel, but then he kept talking. Appellant also interrupted and spoke over a detective before making another statement about the facts of the offense. These findings are supported by the record, and we afford them almost total deference. The trial court concluded that, when appellant continued to discuss the offense without prompting, he initiated further communication.

Appellant's statement to Hargrave was taken at the Humble Police Department on June 21, 2006. Our review of the audiovisual recording of the statement confirms that appellant invoked his right to counsel toward the end of the interview. By then, appellant had already admitted his involvement in the aggravated robbery of the couple, and he had named his accomplices. Appellant still maintained that, when he drove away in the Matrix with Louis and Fields, he left the couple standing on the street, unharmed. Hargrave then expressed his intention to end the interview, but indicated that he still did not believe appellant had told him everything. Hargrave told appellant that the detectives could not make any deals for appellant, but that if appellant wanted to ask the district attorney for leniency, then he would need to disclose the full story and "be right." The conversation then continued as follows:

> Appellant: I'm trying, I'm trying, I'm trying to be right, I'm trying to [incomprehensible] you [incomprehensible] for all I know. That's all I know right now. I don't even want to talk no more until I get me a

lawyer or something.  Because I, I, I keep on telling y'all, I done told y'all everything.  I wouldn't have gave up them names if I didn't know everything I knew.  I'm not, I'm not no rat, no little snitch like that.  I done told y'all everything I knew though.  That's everything right there.  I'm not going to, come on now.

Campell:  [from the side] What do you mean – [6]

Appellant:  [interrupting, incomprehensible] – that's a snitch though –

[Campbell and appellant both incomprehensible, talking simultaneously.]

Appellant:  – I gave up my brother.  I told you what he did and I know he didn't kill her.  He was in the car with me.  Louis [was] in the car with me.  We drove out.

Hargrave:  Yeah.

Appellant:  I told you everything that I know, so –

Hargrave:  Yes, but you also told us that you didn't take anyone away from the situation.  You did.  So someone –

Appellant:  [interrupting, incomprehensible] – I took somebody away.

Hargrave:  Huh?

Appellant:  So you saying I took somebody away?

Hargrave:  You and your crew.

Appellant:  I didn't take nobody away.

After a few more questions, Hargrave stopped talking to appellant.  Caruthers then sat down at the table and asked appellant for his cell phone number.  As Hargrave gathered up his papers and

---

[6] The State's appellate brief characterizes Campbell's words as an attempt to clarify appellant's assertion that he did not want to talk anymore without a lawyer.  Our review of the audiovisual recording neither supports nor contradicts this characterization.  It is apparent, however, that appellant did not respond to Campbell's question but instead interrupted and spoke over Campbell, so that Campbell gave up.  *Cf. Moran v. State,* 213 S.W.3d 917, 923 (Tex. Crim. App. 2007) (finding it significant that officer's post-invocation comment did not affect appellant's decision to re-initiate conversation).

left the room, Caruthers asked appellant for background information about his associates, and whether he had been involved in other offenses. A few minutes later, Caruthers stated that he was ending the interview.

When an accused of his own volition resumes talking after invoking his right to counsel, this conduct may constitute initiating further communication. *See, e.g., Etheridge,* 903 S.W.2d at 17-18. Here, appellant continued to talk without prompting. In the context of Hargrave's earlier comment that he did not believe appellant had told him everything, appellant's post-invocation statement, insisting that he had told Hargrave everything and reiterating a prior statement about the facts of the offense, conveyed a willingness to talk about the investigation and constituted the initiation of further communication. *See Edwards,* 451 U.S. at 484-85; *Cross,* 144 S.W.3d at 528. Therefore the police were not prevented from approaching appellant on a later date, provided that appellant knowingly and intelligently waived his rights before further interrogation.

Two days after Hargrave questioned appellant, Abbondondalo questioned appellant at the Houston Police Department's homicide division. Abbondondalo testified that before he began questioning appellant, he read appellant the required warnings, and appellant stated that he understood them and agreed to talk. Our review of the audio recording reveals that after appellant indicated that he understood the warnings, Abbondondalo asked him if he felt comfortable talking. Abbondondalo mentioned that appellant's friends were telling their side of the story. Although appellant did not directly answer the question about whether he felt comfortable talking, he interrupted Abbondondalo's remark about his friends and began discussing the case. Before and during his statement, appellant did not express any reluctance to discuss the offense with Abbondondalo.

At the end of appellant's statement, Abbondondalo told appellant that he needed to go to the restroom but that they would talk more when he came back. Appellant agreed. Abbondondalo also offered to find an officer to escort appellant to the restroom and to order some food for appellant, and appellant accepted. The audio recording ended when Abbondondalo left the room. Abbondondalo testified that while he was gone, someone from the crime scene unit entered the office and took a buccal swab from appellant. When Abbondondalo returned, he could sense that appellant's mood had changed. Appellant said that he did not want to talk anymore, so Abbondondalo terminated the interview.

The record demonstrates that on June 21, 2006, appellant invoked his right to counsel during his interview with Hargrave. However, during that same interview, he initiated further communication. Two days later, on June 23, 2006, appellant knowingly and intelligently waived his right to counsel before he made his statement to Abbondondalo. Hence, the trial court did not abuse its discretion by denying appellant's motion to suppress his statement to Abbondondalo. Point of error four is overruled.

We affirm the judgment of the trial court.

Delivered: January 27, 2010
Do Not Publish