# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 14, 2001 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. DOROTHY HOPSON

**Appeal from the Circuit Court for Grainger County**
**No. 7036     Richard R. Vance, Circuit Judge**

**FILED APRIL 10, 2001**

**No. E2000-01606-COA-R3-CV**

Dorothy Hopson appeals a determination that her parental rights should be terminated as to her two daughters upon the grounds that the Trial Court was in error in allowing into evidence statements made by the children to third parties; in finding that the evidence was clear and convincing that she had committed child abuse as to her children; and in finding that termination of her parental rights was in the best interest of the children.  We affirm.

**Tenn.R.App.P.  3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

Edward R. Sempkowski, Morristown, Tennessee, for the Appellant, Dorothy Hopson

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee Department of Children's Services

## OPINION

Dorothy Hopson appeals a determination that her parental rights should be terminated as to her two daughters, T. C., D.O.B. 9-13-88, and E. C., D.O.B. 2-29-92.  By her three issues on appeal she insists that the Trial Court was in error in allowing into evidence statements made by the children to third parties; in finding that the evidence was clear and convincing that she had committed child abuse as to her children; and in finding that termination of her parental rights was in the best interest of the children.

The genesis of this lawsuit was a complaint made to the Grainger County office of the Department of Children's Services that the children had been molested by their Father, Eddie

Carpenter, who – although they were never married – had lived with Ms. Hopson for approximately 13 years, and who, on August 6, 1999, after an investigation was initiated, committed suicide.

In the course of the investigation, T. was interviewed by an Investigator of the Department of Children's Services and reported to him that she had been sexually abused by her Father on a number of occasions and that her Mother had held her while the abuse took place. Thereafter, this suit was filed seeking to terminate the Mother's parental rights.

A number of witnesses testified, and we will now summarize, in order of appearance, the testimony they gave pertinent to disposition of this appeal.

The G*uardian Ad Litem* for the children, was his opinion after talking to them that abuse did occur. However, T. told him that her Mother never abused her and she wanted to go home. E. also wanted to go home, but said her Father did "bad stuff." One of the children, we assume it was T., who was more communicative, told him that the Father beat the Mother and threatened to kill her.

The *Guardian Ad Litem* also testified that he had no reason to doubt what the children were telling him.

An Investigator for the Department of Children's Services interviewed the children after a complaint was made that they were being abused.

He interviewed T. on June 22, 1999, and she told him the following, which we quote from his testimony:

Q    What did [T.] tell you?

A    At that point she had stated that she had had enough, that she just couldn't take what was going on, especially now that this was happening with her younger sister, [E.], as well. She stated to me that she was being sexually abused by her Father, Eddie, and this had been going on for some time.

What she described, she described Eddie fondling her, touching her breasts, her vaginal area, Eddie attempting to French kiss her, to make-out with her virtually. She indicated that he had attempted to make her perform oral sex at that point and had attempted to go further at different times.

She also indicated that her Mother was aware of this, that this had been going on for quite some time, and that in fact her Mother had participated by holding her on a couple of occasions.

Upon cross-examination a medical report was introduced which revealed no physical evidence of sexual abuse. T. also told the Investigator that her Father was licking her on the face and stomach. T. never told him that her Mother was performing sex acts. The Investigator further detailed what Tammy, also known as Vinnie, an older half-sister of T. and E., what T. supposedly told her, which was "Yes, this is going on," and that Tammy believed it because it had happened to her when she was younger.

The Investigator's testimony was suspended so that T. and E. might testify.

T., who, at the time of the trial was 11 years old, said that her Father touched her "in a wrong way," and "touched me where he shouldn't have," and when asked, said it was on her chest, but said he did not touch her anywhere else. She told her Mother about this touching, and did not think her Mother was present when the touching occurred. The Father also touched her a couple of times after she told her Mother.

On cross-examination by the *Guardian Ad Litem* T. testified that she did not see any inappropriate action by her Father as to her sister E. She also said that her Father "threatened to kill my mother if I told," and that her Father was violent toward her Mother a lot. On re-direct examination she said that after she told her Mother about her Father touching her, he continued to live in the house and touched her a couple of times.

The Trial Judge then questioned T. and, although she was reluctant to testify, upon his gentle questioning, gave the following evidence:

BY THE COURT:

Q   [T.], back last summer in June or July when you left the home and went with the Children Services, then you talked to Mr. Dockery[1] and you talked to, I think, a doctor at the hospital and maybe to a psychologist. Do you remember talking to any of those people?

A   I remember – well, I talk now to – I go to counseling on every Tuesday now.

Q   And you talked to Mr. Burts?[2]

A   Yeah.

Q   Did you tell them a lot more than you're telling me today about things that happened?

---

[1]   Mr. Dockeery worked for the Department of Children's Services as an Investigator.

[2]   Mr. Burts is the children's *Guardian Ad Litem*.

A    Yeah.

Q    What did you tell them that you didn't tell me?

A    I'm not for sure.  I mean, I just told them about Dad and what he did and all of that.

Q    Did you tell them that he had touched you in your private area?

A    No, he made me touch him.

Q    And did you tell them that at some point your Mother had actually held you while he did that?

A    No, I don't think so.

Q    What about your sister, [E.]?

A    She's told me – she told me that Dad had messed with her too a little, but I don't know if that's true or not.  I didn't see it.

Q    You said you're not afraid of your dad because he's gone.  Where is your Father?

A    I'm not for sure.  I know he killed hisself or something like that.

Q    So you are no longer afraid of him?

A    No.

Q    Is there any reason why you wouldn't tell me everything that you had told the other people before?

A    I don't think so.

Q    Any reason why you don't want to tell me everything that happened?

A    Well, it's sort of disgusting.

Q    I know that.  I know that, and I've talked to a lot of children before in things like this and I understand that it's embarrassing to you, but it's important to know that we're not talking about anything that you did, we are talking about what your Father did, that you are not to blame for, that you didn't cause, that you didn't do.

-4-

And it's not your fault, but it's important that I know what happened, you see. And we are talking about what he did, not what you did. That is why I need to know because I have got to decide some things. And in order for me to decide, I have to know what happened. Do you understand that?

A    Uh-huh.

Q    Even though it was disgusting, you didn't like it, it was bad, these are things that happened in the past, and it's nothing that you are responsible for. That is important for you to know, that nobody is holding you responsible for any of those things. But I have to know what all happened. Is there some more that you want to tell me?

A     Oh, yeah. He's touched me in other places that I didn't want to tell about because it was really disgusting, and I didn't tell you about that, but that's it.

Q    And apparently this happened over a long, long time?

A    Yeah, well, eight months ago I guess.

Q    No, I mean when did it start, about how old were you, do you remember?

A    Yeah, I was around – I'd say I was 9.

Q    And did it happen a lot?

A    Well, it happened every time he got drunk actually.

Q    And did your Mother ever try to stop him from doing it?

A    I don't know.

Q    Did she ever fuss at him for what he was doing?

A     I mean, him and her got in some fights and fusses. Sometimes they got in fusses, and sometimes they got in fights, but I don't know a lot about it.

Q    And you told me earlier that you told your Mother about what he was doing to you?

A    Yeah.

Q    Did you ever hear her fuss at him for doing any of that?

A    I heard her talk to him about it, I guess.  I think.

Q    But he kept doing it?

A    Yeah.  Well, she couldn't really stop him.

E., whose eighth birthday was the day before she was called as a witness, testified that her Mother never touched her in a bad way.  She did, however, say her Father abused her.

The Department of Human Services Investigator was then recalled.  He related that T. told him one time that she was outside in the freezing cold and a dog covered her and kept her from freezing.  He further detailed T.'s statement as follows:

Q    And also in that interview, that 7/12 interview, of the girls, especially the interview with [T.], she told you - and again I'm on page 13 of your interview – that her Father had tried to get her into bed naked?

A    Right.

Q    Did you read the doctor's deposition?

A    I saw that deposition as well.

Q    And in that deposition when the doctor specifically – well, I'm not going to ask what he said.  In the doctor's deposition there she said she always had her clothes on, didn't she?

A    She made that statement at that point.

Q    But with you, at least at one point, she said she was naked?

A    Uh-huh.

Q    Now, again at page 13 where you're asking her about what her mom's involvement is, whether your mom held you.  At page 13 at the top, she said, She held me; that was the only time she done it.

A    Yeah, I see that.  When she made that statement, that she held her that one time, and that's the only time she did it, and later like I asked her again and she said she only did it once or twice.

Q    Now, on page 13 again she talks about being kissed and licked all over by her Father with her clothes off; am I correct?

A    Is that where he would kiss me here and lick me here in my ears and on my neck?

Q    Right.

A    Yes.

Q    And she said her clothes were off?

A    Right.

Q    Again, I go back to the deposition of Dr. Ford.  She told him her clothes were never off?

A    That's correct.

Q    Do you find that inconsistent?

A    Like I said at the beginning, when you're interviewing kids sometimes, like I said, they will run things together.  And depending on how you ask a question, you may not mean it to be leading or you may think of it as totally innocuous or innocent, but they may take it a different way; they will try to answer sometimes in a way – you don't even realize you may be leading at that point.  So, no, I don't find it inconsistent.

Shawna Duty, age 20, a niece of the Father, next testified.  She said T. told her the Father and Mother "made her do stuff and showed her how to do it.  Shawna also said that the Father had molested her, starting when she was 12 years old, that the Mother knew of the situation because she would come to the house next door where Ms. Duty lived to get her for the Father to abuse.

A half-sister of T. and E.., Vinnie Ann Hayes, also known as Tammy, age 25, stated that T. told her that her Mother had held her down, and that the same thing happened to her beginning when she was nine years of age.  Her testimony was graphic as to one incident:

Q    Did you have a conversation with [T.] or [E.] about their dad, your dad?

A    Yes.

Q    Did you ever have a conversation with them about anything inappropriate that was going on between them?

-7-

A    Yes.

Q    Can you tell me what that conversation entailed. First of all, was it [T.] or [E.]?

A    [T.]. She said that her Father fondled her and that her Mother got her up in the middle of the nights. She was afraid to sleep at home because of it and that she would hold her down while her Father had oral sex with her.

Q    Did she tell you how old she was when that first happened?

A    I can't remember, but I think she did. I'm not sure. I can't remember.

Q    Now, did she appear to be truthful to you?

A    Yes.

Q    Why do you think that she was telling the truth?

A    The same thing happened to me, ma'am.

Q    What happened to you?

A    He started fondling me when I was about nine. He fondled me and had oral sex with me and used things on me, trying to get me ready for, I guess, his sexual fantasies. But he didn't actually have intercourse with me until after I started having my periods. And after my first one, he attacked me in the bathroom, and I was bleeding.

Q    And how old were you?

A    Twelve.

Q    Did Ms. Hopson know about this?

A    I don't think she did.

Upon the Court questioning Mrs. Hayes, she gave the following testimony:

EXAMINATION BY THE COURT:

Q    Mrs. Hayes, I have a question. You were asked if Dorothy knew what happened to you, referring to Ms. Hopson, and you said, no, not with me. Do you

-8-

know whether or not she knew what was happening or if anything at all was happening between Eddie and [T.]?

A    Well, [T.] said she held her down while he did oral sex and fondled and all of this in the middle of the night.  She told me that if she refused and stuff like that, that she would get violent with her, pull her hair, choke her, this and that and the other.

Q    That's [T.] talking about Ms. Hopson?

A    Yes.

After Mrs. Hayes' testimony the State rested and Brenda Miller, former step-mother of the children's Mother, testified that T. had been untruthful with her on two occasions.  The first when she said that E. had a bicycle accident and had six rocks in her head, when in fact, as we understand the record, had six holes in her head.  She also testified about T. stealing a necklace from a little girl who was a neighbor to the witness.  She stated that she would not trust T., that she doesn't tell the truth, and "will look you right in the eye and tell you a lie."

The Mother, age 41, testified next.  She said the Father died on August 6, 1999, when he committed suicide in front of her and three other people.  She conceded that T. told her the Father had toucher her once and she told the Father that if he did it again she would kill him.  Although the Mother had contended she had only been told once about the improper actions by the Father directed at T., in contradiction thereof, she testified the following:

THE COURT : Rephrase.  Start over.

Q    There was a time when the girls were examined by the doctor, that the report was made an exhibit.  Now, [T.] told you after that that her Father had touched her?

A    After that.

Q    So when [T.] told you, I think I may have already asked you this question, that didn't say to you perhaps they were right, my daughter is being sexually abused by this man?

A    Because she had said it so many different times.

Q    She had said it so many different times?

A    [T.] has told so many lies that you couldn't believe [T.].

The next question posed to the Mother produced an astonishing response:

Q   But you believe her now, and we're supposed to believe that you will protect her in the future?

A   Yes, I will protect my kids like I have always protected my kids.

Several witnesses were called to attack T.'s credibility. Melissa Majors, a cousin to the Father, stated you can't believe "nothing she says." Marian Dean, a friend of the Mother, testified that T.'s reputation for truthfulness was "very bad," and Glenda Allen, also a friend of the Mother, testified that she would not trust T. nor believe her. The grandfather of T. and E., Frazier Carpenter, testified T. would tell "fibs," but that E. seemed to be truthful.

Clovis E. Stair, who had earned a Ph.D. degree in counseling psychology, testified by deposition that T. "stated that her mother held her down while her father sexually abused her." T. also told Dr. Stair that "her Mother was aware of the abuse and participated in the abuse." Still further Dr. Stair testified as follows:

A   [T.] was very angry with both of her parents. She had a lot of confusion about why they would treat her so. She seemed especially indignant because she had – she told me that they were now abusing the little sister and that's why she came forward, is she did not want her sister going through what she went through. She was very angry with her Mother for knowing and participating in the abuse.

Finally, she stated that T. seemed credible.

Whereupon, Dr. Stair was asked about an older sister of T. and purported to testify what the sister had told her. An objection was made which we believe is valid. While the sister was under the age of 13 at the time of the incident she related to Dr. Stair, we conclude the hearsay exception as to children's statements only apply in a case involving the child. We reach this conclusion because of the language in the rule which speaks of "a child alleged to be the victim of physical, sexual or psychological abuse or neglect."

Dr. Ronald A. Ford, a pediatrician, also testified by deposition. He testified as follows:

A   This is a narrative of my conversation with [T.]. My first question was do you know why you came to see me today. Her response was no. Next question, has anything happened that was yucky or not okay. Response, yes or yeah.

She continued, I lived with my mom and dad but stayed with my papaw a lot. I think it was July and my dad, he was playing and he was fooling around with me up here, at which time she pointed to her chest, and down there, and she pointed to her groin area.

-10-

I asked how many times did it happen. Response was a bunch, ever since 1988. She continued, he done Tommy, Shonda, Randy, Danny, Jennifer. He done them all like that, and [E.], the one in there. I asked her if she had ever gotten hurt, the response was no. I asked what did he touch. She responded, down there, and she pointed to the area between her legs. I asked what do you call that part. She responded, my private.

The next page, I asked, did he make you touch him anywhere? Her response, he made me kiss him on the mouth but nowhere else and play with his penis. My question, did he ever touch you with anything else besides his hand. Response, no. Question, did anything ever come out of his penis that you saw. Response, no.

Question, did he use any goo or jelly or anything like a tiny rubber glove. The response was no to all of these. Question, did he ever bother your bottom in any way. Response, no. Question, did you have your clothes on or off when it happened. Response, on. Question, how about him. On was her response.

Question, how did he touch you. Response, he put his hands inside my pants. Question, did he touch you on the inside of your privates or the outside. Response, outside. Question, anything else. Response, I saw him do it to only one other person, Nikki Turner, she's eighteen.

What else did you see, I asked. She responds, he was fooling around with her while she watched TV. He put his hands down her pants and threw her down, then my mom made me get out of the room. My next question was, what else happened. Her response, at once or twice he made my mom hold me down while my dad did it to me but it wasn't her fault because he said he would kill her if she didn't. That was the end of the interview.

Dr. Ford likewise found T. to be credible.

The most damning testimony was elicited by Dr. Ford from E., who had been drawing pictures while he conversed with T. Describing the pictures, Dr. Ford testified E. informed him of the following:

Q    Could you read me what it says there on the description of the alleged assault?

A    Yes. [E.], quote unquote, was rather shy today and after much coaxing by me came out of her shell some. While I had interviewed her older sister today, [E.] had drawn a picture in the other room while waiting with Ms. Pruitt.

-11-

Q    Is a copy of that picture attached to the record?

A    Yes, it is.

Q    And the information in this record was gathered by you for what purpose?

A    Again, to make a medical diagnosis and to know what to check for on the physical examination.

Q    Okay.  So then continue on.  Just tell me what it says on the description of alleged assault.

A    I had [E.] show and explain the picture to open up a dialogue.  I asked her about each of the three frames on the page.  Then the frame I termed number one was in the left, upper left corner of the page which is this, this panel right here.

I asked her what this was a picture of and she responded, this is my daddy. I asked where is he.  She said laying down.  I asked what's this, pointing to this line going across this way, horizontal line.  The response, I don't want to say.

We moved on to the upper right-hand panel, this one right here.  What's this a picture of.  She responded, me and my daddy.  I asked, what are you doing. Her response, it's nasty.  Question, did you get hurt this time?  Response. yeah. Question, what got hurt on you?  The child looked down and said I don't want to say.  My question, can you point and show me what got hurt.  The child points to the area of where her genitals are.

What did he hurt you with?  Her response, I don't want to say.  My question, with his hand?  Her response, no.  With something else?  Her response, yeah.  With what, I asked.  No response.  Point and show me where it would be on daddy.  She pointed over her genital area.

We moved on to the panel --  the picture at the bottom of the page down here.  What's this a picture of, I asked.  Her response, my mommy.  I asked, what's she doing.  Her response, holding me down.  My question, why is she holding you down.  Her response, because Daddy told her to.  My question, where is Daddy.  Her response, on me.  I asked, what's he doing.  Her response, it's nasty.  I asked, did your bottom get hurt?  She replied no.  That was the end of my interview with her.

Q    During the course of your taking of this history from [E.] did she appear to be credible?

MR. SEMPKOWSKI: Objection.

Q   Go ahead.

A   She was credible in as far as I believed she was telling me what – exactly what she drew. I believed that what she was saying was what she had drawn a picture of, yes.

Q   What do you base your belief that she was credible?

A   Well, she was very forthcoming and very matter-of-fact, again, about the pictures and was easily able to explain without stumbling or without really having to think much about it.

Before addressing the issues on appeal, we point out that in non-jury cases our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct. Tenn.R.App.P. 13(d). We must honor that presumption unless we find that the evidence preponderates against the trial court's factual findings. Union Carbide Corp. v. Huddleston, 854 S.W.2d 87 (Tenn. 1993). The trial court's conclusions of law, however, are not accorded the same deference. Campbell v. Florida Steel Corp., 919 S.W.2d 26 (Tenn. 1996).

As to the first issue, the applicability of Rule 803(25) of the Rules of Evidence relative to an exception to the Hearsay Rule, is determinative. It provides as follows:

> **Rule 803. Hearsay exceptions. —** The following are not excluded by the hearsay rule:
>
> . . . .
>
> (25) Children Statements — Unless the circumstances indicate lack of trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of dependency and neglect pursuant to T.C.A. § 37-1-102(b)(10) [§ 37-1-102(b)(12)], issues concerning severe child abuse pursuant to T.C.A. § 37-1-102(b)(19) [§ 37-1-102(b)(21)], or issues concerning termination of parental rights pursuant to T.C.A. § 37-1-147(d). Declarants of age thirteen or older at the time of the hearing must testify at the hearing unless unavailable as defined by T.R.Evid. 804(a); otherwise this exception is inapplicable to their extrajudicial statements.

While there is considerable evidence that T. is not credible, there is also considerable evidence that she was. In addition thereto, the Trial Judge had the opportunity to hear both of the

children testify and make a judgment as to their credibility based upon his observations while they were testifying. Moreover, as has often been held, the trial judge is in a better position to judge credibility of witnesses than an appellate court. <u>Tenn-Tex Properties v. Brownell-Electro</u>, 779 S.W.2d 423 (Tenn. 1989).

We recognize that many of the incriminating statements were made to third parties, and the Trial Court was not present when they were made. Nevertheless, we believe the children's appearance in person, coupled with the opinions of certain of the third party witnesses that they appeared to be credible, is sufficient to meet the requirements of the Rule.

In reaching our determination we are not unmindful that there are discrepancies in T.'s statements regarding the incidences when she was abused, such as whether her clothes were on or off; however, we do not think the circumstances surrounding her testimony "indicate lack of trustworthiness" which would preclude consideration of her statements.

Finally, we note that even if the statements to third parties by T. had been excluded, the credibility of E. was never questioned in any manner and in our view her testimony in court and statements to third parties standing alone, particularly that concerning the pictures she drew, was sufficient to justify a finding of child abuse by the Mother.

As to the other two issues, we heartily concur in the Trial Court's determination in regard thereto, wherein he stated the following:

> The Court has to believe the fact that the past several months have been the only peace this child has had since she was old enough to remember, not only of things that happened to her, but things that happened to others around her, that she watched it, she saw, and was forced to endure, not the least of which was violence between her father and her mother, threats of murder by her father. There is not peace in that home at all.
>
> Of course this issue is cloudy somewhat, but the fact is that the principal physical actor is now dead and gone from the home, so the argument can be made that, well, it's safe, come on back. It's safe now; Eddie Carpenter is dead. So we look at the law, and we look at what the law says. The parent or guardian that has been found to have committed severe child abuse is defined in 37.102,[3] for or against any sibling or half-sibling of such child.
>
> Within the time frame of Ms. Hopson's life with Mr. Eddie Carpenter both of these children were abused by Eddie Carpenter. It is somewhat unclear about the older child, but it is clear that Jennifer was removed from that home and is

---

[3] We assume the court reporter mistranscribed the Trial Court's words and that the correct Code Section is T.C.A. 37-1-102.

presently undergoing mental treatment years later, again during the time that Mr. Eddie Carpenter was there.

Because of some of the conflicts of statements made by the children, the Court was looking closely at her testimony, and with the previous information that she had provided, and looking carefully at what Ms. Hopson would have to say. I don't know if testimony has been given in Juvenile Court or other proceedings by her or not, but they are not part of this record. I haven't seen them.

I have no idea what she may have said before other than in the investigation at the initial outset where it was first brought to light that Mr. Carpenter was committing major crimes against these children, that we just simply don't have any information from her. I don't hold that against you. But no one talked to her; no one came and interviewed her. We don't have it.

My point is I was looking forward to hearing what you did have to say since you are apparently not bound by any former testimony or statements. Quite frankly the Court was severely disappointed in your testimony, severely. Not that you — because you did not support your child. You did not give the support this child needed today. This child who has been through agony and trauma, unspeakable things, who would love to come home, didn't get the support from you that persuades this Court that she ought to come home.

She still needs your protection if she were going to be with you. She needed it here today; she didn't get it. She didn't get it, which leads the Court to believe all the more that what she had told, the events she described, was the truth. I cannot condone that conduct. Even at the very best, you knew about it, the child told you about it, you did absolutely nothing to protect her, did not report it, testified yourself she was a liar, brought others in to say that she was a liar. What kind of support is she going to get in the future if all she is going to get from her mother is disbelief?

The Court must find, does find, that provisions of 36-1-113 have been proven by clear and convincing evidence in that this child suffered unspeakable abuse at the hands of Eddie Carpenter, unspeakable abuse with the knowledge of this mother who failed to report it. And there is credible evidence to believe that you assisted on at least one occasion.

The second part is what is in the best interest of the children. Having made that finding, I still have to go to the next step, what is the best interest of these children. Eleven and eight by a day, [E.] had a birthday yesterday, what is in their best interest? Their best interest is a loving home of a parent who would

support them, care for them, love them, protect them, believe them. That is in their best interest.

I have seen nothing from this proof that persuades me that Ms. Hopson is able to provide that home. She has not provided it in the eleven years of their lifetime, their joint lifetime, eleven and eight. The Court has no reason based upon the testimony I have seen here today that placing the children within the custody of the Department of Children Services, which has already taken place, is not the best place for children either. That is way down on the pecking order.

You start with the parents. If one parent needs to be taken out of the picture, then you go to the next parent. Take that parent out of the picture, you go to a close relative. The last place you put the children is the Department of Children Services, not to say it is bad, it's simply you give preference to relatives, you give preference to a loving, caring family relationship if you can find it.

The concerns of the Court in making these decisions is what has taken place in the past several months. Ms. Hopson has had some hard times, no question. The children were taken from her care; Mr. Carpenter, who stood in the relationship of her husband, killed himself in front of her. It is horrible, horrifying, horrifying things that have happened.

I have to also look at what has Ms. Hopson done to prepare herself for the day that would come when she would seek to have her children return home and seek to persuade the Court that that is the best place for them, that the best interest of the little children would be that they would be with her. She has had many months to prepare that. I have seen nothing in the way of any effort to create an atmosphere that these children should return to.

So the judgment of the Court is that the parental rights will be terminated, and the children will be placed permanently with the Department of Children Services. If you will prepare a judgment consistent with these findings and have the oral findings typed up and made a part of the judgment.

For the foregoing reasons the judgment of the Trial Court is affirmed in all respects, the cause remanded for such further proceedings, if any, as may be necessary and collection of costs below. Costs of appeal are adjudged against Dorothy Hopson and her surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

-16-