Opinion issued February 15, 2007
















 

 



In The

Court of Appeals

For The

First District of Texas






NO. 01-05-01042-CR

____________


MARVIN CASTENANO, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 232nd District Court

Harris County, Texas

Trial Court Cause No. 997502






MEMORANDUM OPINION

 A jury found appellant, Marvin Castenano, guilty of the offense of aggravated
robbery, (1) and the trial court assessed his punishment at confinement for eight years. 
In three issues, appellant contends that the evidence is factually insufficient to
support his conviction, the trial court erred in admitting into evidence appellant's pre-trial statement, and his trial counsel rendered ineffective assistance of counsel.

 We affirm.

Factual and Procedural Background


 Daniel Gutierrez, the complainant, with the assistance of a Spanish translator,
testified that on August 15, 2004, he, Jose Uribe, and Miguel Saavedera left a party
"[s]omewhere after 2:00 in the morning" in the complainant's car. The complainant
drove Uribe, who was in the front-passenger seat, and Saavedera, who was in the
back seat, to an apartment complex. The complainant parked the car, and two men
"came up crouching on either side of the vehicle and then they both got up at the
same time." One of the two men, wearing a black t-shirt, "had the revolver and was
pointing at [the complainant]" on the driver's side of the car. The other man was at
the front-seat passenger's window. The man with the revolver told the complainant
"[t]o get off the vehicle or off the car and to hand over all of [the complainant's]
belongings." He "put [the gun] on the back of [the complainant's] neck," and "was
very aggressive and he was saying that if [the complainant] moved or stood up he
could shoot [the complainant] or he could shoot at the others." 

 When the complainant got out of his car, one of the men threw the complainant
to the ground and removed what the complainant had in his pockets, taking the
complainant's keys and "some quarters." The complainant feared for his life. The
two men then pulled the other two passengers out of the car and took the wallet of
one of the passengers. The man on the passenger's side "was telling [the
complainant] not to move [be]cause if they did he would shoot because you could tell
he had something underneath the shirt."

 The complainant described the two men: one being "thin, somewhere around
5 foot 6," wearing "a black shirt and black pants," and the other as "almost the same
size but heavy," wearing a t-shirt. A "[s]mall Toyota" truck pulled up behind the
complainant's car, and the two men who had just robbed the complainant and his
passengers got into the truck. As the truck left, the complainant saw a total of three
men inside the truck. 

 The complainant further testified that he and his passengers then called for
emergency assistance, providing "a description of the people that were in the vehicle
and the color and the make of the vehicle." A police officer arrived after "[a]bout 15
minutes," and both the complainant and Uribe spoke with the officer entirely in
English. Although the complainant "speak[s] very little" English and Uribe does not
speak very much English, they "were able to understand what [the officer] was
asking." About one-half of an hour after the robbery, the officer took the complainant
and Uribe to a location "[a]bout ten miles" away "to identify some people that they
had arrested." 

 Out of the three men that the police had detained, the complainant identified
two men as being involved in the robbery, and he was positive in his identification
with regard to "[t]he one that had the revolver." After identifying the men, another
police officer took the complainant and Uribe "to the closest police station." The
officer put the three men "before [them] but this time it was closer and through a
glass." At the police station, the complainant "was sure about" the two men that
robbed him. In court, however, he was not as sure because it had "been a year since"
the robbery. During his testimony, although the complainant identified appellant as
"one of two people that robbed [him]," he was not able to say whether appellant was
the man with the revolver.

 Jose Alfredo Uribe, with the assistance of a Spanish translator, testified that
when he got out of the car, he handed his wallet, which contained "[c]lose to two-thousand five-hundred dollars," over to the man on his side of the car. After the
robbery, when the police officer took Uribe and the complainant to identify the
detained suspects, Uribe, from inside the patrol car, identified three men as being
involved in the robbery. Uribe identified the person who had the gun, noted that he
was wearing a black shirt, and he was sure, at that time, that the three individuals that
the police officers had detained were those involved in the robbery. Later, at the
police station, the police officer returned Uribe's wallet and money to him.

 Houston Police Department ("HPD") Officer J. Lopez, Jr., testified that on
August 15, 2004, at around 3:20 a.m., he and his partner, Officer Benables, responded
to a dispatch for the aggravated robbery. On their way to the apartment complex, the
officers received information over their police radio that the suspects, three Hispanic
men, were driving away in a "black Toyota truck." Approximately one minute later,
Benables "noticed a black truck" traveling in the opposite direction with its tail lights
out. At that point, Lopez and Benables, who "were about two or three miles away"
from the robbery location, stopped the truck because its tail lights did not work. 
Lopez "approached the driver and looked over into the back seat as best [he] could
to the vantage point [he] had and asked the driver to look back to [him] for his license
and insurance." Lopez got the driver's license, "ran the license plate on the computer
system," and then decided to remove the three men from inside the truck and identify
them. Lopez noted that the men matched the description of the robbery suspects
given over their police radio.

 Officer Lopez further testified that they first removed the front-seat passenger
from the truck. As Officer Benables watched the other two suspects, Lopez "did a
quick pat down search for any weapons" of the front-seat passenger. Lopez "walked
him back to the police car [and] put him in the back of the car." Lopez then removed
the back-seat passenger. When Lopez pulled him out, he noticed something
underneath the back seat and told Benables that he thought there was a gun
underneath the back seat. Lopez "went around the front and got the driver out as fast
as [he] could and handcuff[ed] him and put him in the back and [Benables] recovered
the handgun." The officers recovered five bullets from the .357 caliber handgun. In
court, Lopez identified appellant as the back-seat passenger. Lopez also identified
the driver as Emilo Maldonado and the front-seat passenger as Alvin Ortega. After
confiscating the wallets of the three men and searching their pockets, the officers
discovered that appellant "had $900.00," Emilo Maldonado "had $720.00," and Alvin
Ortega "had $875.00," for a total amount of $2,495.00.

 HPD Officer A. Mejia testified that on August 15, 2004, he conducted a
videotaped interview of appellant. Mejia explained that he "primarily deal[s] with
Spanish speaking complainants and/or suspects." Appellant was not handcuffed
during the interview and indicated to Mejia that the language he felt most comfortable
speaking was Spanish. Mejia, fluent in Spanish, conducted the interview in Spanish. 
Mejia stated that appellant did not seem intoxicated or under the influence of any
narcotics, did not appear to be sleepy, and initially "was smiling and almost in a very
relaxed joking type of mood," "smiling and laughing."

 In addition to Mejia, Officer D. Garcia was present for the interview, which
lasted approximately fifteen minutes. In Mejia's presence, Garcia read appellant his
legal rights "verbatim" "[f]rom the blue card that is issued to [the officers] by the
District Attorneys Office." Mejia explained that the blue card has the legal rights in
both English and Spanish, and appellant was read his rights in Spanish. After each
right was read to appellant, Garcia asked appellant whether he understood that right. 
The "[f]irst right was he had the right to remain silent and any statement he [made]
may be used against him in a court of law." Appellant had a question in regard to that
right, and Mejia and Garcia then explained what the right meant, and then "[i]t was
read to him again." After the second reading, the officers asked appellant once again
if he had any questions, and appellant "indicated he understood his rights" and had
no further questions. Garcia read the remainder of appellant's rights to him one at a
time and asked appellant whether he understood each right after that right was read
to him, and appellant indicated that he had no further questions. At no time did
appellant ask to terminate the interview. Mejia explained that neither he nor Garcia
threatened appellant in any way, told appellant that if he gave a statement he would
receive a lesser punishment, or made any promises regarding appellant's statement.

 During Mejia's testimony, the State introduced appellant's videotaped
statement into evidence and played it for the jury. (2) After the videotape was played,
Mejia explained that he used "a lot of strong language and slang" during the
interview "to try to relate" to appellant. Mejia "felt that [he] needed to express the
seriousness of the offense." During appellant's statement, Mejia asked appellant
"how much he weighed" because Mejia "wanted [appellant] to understand the
severity of what he was being charged with" as appellant "was laughing" during the
statement. It appeared to Mejia that appellant understood that he was not under an
obligation to agree to an interview. Mejia discussed the possibilities of punishment
and probation "[s]o [appellant] would know the range of punishment when being
charged with a felony." Mejia explained that at no point did he tell appellant that if
he gave a statement he would receive either probation or the minimum sentence.

 In his statement, appellant told Mejia that Maldonado and Ortega knew about
the robbery, but that appellant "was just along for the ride." At one point, appellant
denied even being present at the robbery or knowing anything about the robbery. 
Later, appellant admitted being present at the robbery and getting $700.00. Appellant
told Mejia that "the one that had the gun told me to go around and crouching." When
questioned as to what type of gun was used in the robbery, appellant stated that it was
a revolver. Appellant indicated that he was on the passenger side of the
complainant's car during the robbery.

 On cross-examination, Mejia testified that prior to Garcia reading appellant his
rights, he did not know appellant's educational level, nor did he ascertain whether
appellant could read or write the Spanish language. Mejia tried to tell appellant that
Mejia did not know whether appellant would be eligible for probation and the
punishment range for the offense was confinement for five to ninety-nine years or
life. Mejia explained to appellant that "this was his opportunity to tell [Mejia] what
happened." Mejia admitted using "some pretty heavy language," which included
telling appellant that he would be "made a girlfriend because he has a pretty face." 
Mejia agreed that appellant stated that he did not do anything and did not know that
Ortega was planning on a robbery. However, when appellant saw him, Ortega had
a gun. Appellant also told Mejia that after Ortega threw the complainants on the
ground, he then threw their wallets to appellant.

Factual Sufficiency


 In his first issue, appellant argues that the evidence is factually insufficient to
support his conviction for aggravated robbery "as a principal or as a party" because
"[n]o eyewitness specifically identified . . . [a]ppellant as one of the actual
participants" and "[a]ppellant's mere presence was not enough to find . . . [a]ppellant
guilty."

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
jury's verdict seems "clearly wrong and manifestly unjust," or the proof of guilt,
although legally sufficient, is nevertheless against the great weight and preponderance
of the evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). 
In performing a factual sufficiency review, we are to give deference to the fact
finder's determinations, including determinations involving the credibility and
demeanor of witnesses. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
We may not substitute our judgment for the fact finder's. Watson, 204 S.W.3d at
414-15.

 A person commits the offense of robbery if, in the course of committing theft
and with the intent to obtain or maintain control of the property, he intentionally or
knowingly threatens or places another in fear of imminent bodily injury or death. 
Tex. Pen. Code Ann. § 29.02(a)(2) (Vernon 2003). A person commits the offense
of aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. 
Id. § 29.03(a)(2) (Vernon 2003).

 Under the law of parties, a person is "criminally responsible as a party to an
offense if the offense is committed by his own conduct, by the conduct of another for
which he is criminally responsible, or by both." Id. § 7.01(a) (Vernon 2003). Each
party to an offense may be charged with commission of the offense. Id. § 7.01(b)
(Vernon 2003). A person is "criminally responsible" for an offense committed by the
conduct of another if, "acting with intent to promote or assist the commission of the
offense, he solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense." Id. § 7.02(a)(2) (Vernon 2003).

 To establish guilt under the law of parties, the evidence must show that, at the
time of the offense, the parties were acting together, each contributing some part
towards the execution of their common purpose. See Ransom v. State, 920 S.W.2d
288, 302 (Tex. Crim. App. 1994); Ahrens v. State, 43 S.W.3d 630, 633-34 (Tex.
App.--Houston [1st Dist.] 2001, pet. ref'd). In determining whether a defendant
participated in an offense as a party, the fact finder may examine the events occurring
before, during, and after the commission of the offense and may rely on actions of the
defendant that show an understanding and common design to commit the offense. 
Ransom, 920 S.W.2d at 302; Ahrens, 43 S.W.3d at 633-34. Each fact need not point
directly and independently to the guilt of the defendant, as long as the cumulative
effect of all the incriminating facts are sufficient to support the conviction. Guevara
v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); see also Alexander v. State, 740
S.W.2d 749, 758 (Tex. Crim. App. 1987). Intent may also be inferred from
circumstantial evidence such as acts, words, and the conduct of the defendant. 
Guevara, 152 S.W.3d at 50; Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App.
1995).

 Appellant asserts that "[t]he record merely shows that the State's witnesses
identified . . . [a]ppellant as one of three men who were involved in the robbery" and
that "[t]he witnesses provided weak identification evidence that . . . [a]ppellant,
himself, actually participated in the robbery." Appellant concedes that "[i]t is
undisputed that three men were involved in the robbery, Alvin Ortega, Emilo
Maldonado, and [appellant]," but further asserts that "[a]ppellant's mere presence at
the scene of the crime was not sufficient to prove that he was a party to the crime"
and that "there is no evidence that he was a willing participant."

 However, the evidence shows that shortly after the robbery occurred, police
officers stopped a black truck containing appellant and two other suspects. Inside the
truck, police officers recovered a gun matching a description given to them by the 
complainant and Uribe, the complainant's keys, and $2,495.00, which was roughly
divided among appellant and the other two suspects. Although the police offense
report indicates that the complainant and Uribe had identified Ortega as the gunman
and Maldonado as the person who approached the passenger's side of the car, the
complainant testified that appellant was one of the two men who actually robbed him. 
Uribe testified that while the man on the driver's side of the car was pointing a gun
at the complainant, the man on the passenger side of the car told Uribe that if he
moved he would be shot. The complainant and Uribe stated that the man who
approached the passenger's side of the car had something underneath his shirt, and
from this a jury could have inferred that he possessed a weapon. Also, Officer Lopez
identified appellant as the person in the nearest proximity to the gun found in the
backseat of the truck. 

 In his videotaped statement, appellant initially denied being aware that a
robbery was going to take place. However, appellant later told Officer Mejia that
during the robbery "the one with the gun told [him] to go around and crouching," and
indicating that appellant was on the passenger side of the complainant's car during
the robbery. Moreover, he told Mejia that Ortega threw the wallets of the victims to
him after Ortega threw the men to the ground. Finally, he also admitted to receiving
$700.00 of Uribe's money.

 Viewing all of the evidence neutrally, we conclude that the evidence was not
so obviously weak such that the jury's verdict seems "clearly wrong and manifestly
unjust" or that the proof of guilt is against the great weight and preponderance of the
evidence. Accordingly, we hold that the evidence is factually sufficient to support
appellant's conviction for the offense of aggravated robbery.

 We overrule appellant's first issue.

Admissibility of Statement


 In his second issue, appellant argues that the trial court erred in denying his
motion to suppress his videotaped statement to Officer Mejia because it "was a
product of improper police interrogation techniques," "was coerced," and "[t]he
record shows that the police officer who interviewed [appellant] for the statement
used unlawful measures to obtain it."

Waiver

 We note, initially, that the State argues that because appellant "did not renew
his motion to suppress or earlier objections to his videotaped statement" during
Officer Mejia's testimony, his "assertion that the complained-of remarks rendered his
videotaped statement involuntary was . . . not preserved for appellate review." When
a pre-trial motion to suppress evidence is overruled, the defendant need not
subsequently object at trial to the same evidence in order to preserve error on appeal. 
Moraguez v. State, 701 S.W.2d 902, 904 (Tex. App. Crim. 1986). However, when
a defendant affirmatively states that he has "no objection" at trial to the admission of
the complained-of evidence, he waives any error in the admission of the evidence,
despite the pretrial ruling. Moody v. State, 827 S.W.2d 875, 889 (Tex. Crim. App.
1992).

 The record indicates that prior to trial, appellant filed a motion to suppress the
videotaped statement. The trial court denied the motion and entered "findings and
conclusions." (3) At trial, during Officer Mejia's testimony, the State offered into
evidence the videotaped statement. At that time, the following exchange occurred, 

[Appellant's Counsel]: I've already got an objection to the exhibit
Your Honor.


[Trial Court]: Yes, sir you do and it's overruled.

The videotaped statement was then admitted into evidence as State's Exhibit 2, and
an English translation of the statement was admitted as State's Exhibit 2A. After it
was established that appellant had a running objection to the videotaped statement,
the statement was played for the jury. Here, appellant secured an adverse ruling on
his pre-trial motion to suppress and, at trial, made an additional objection to the
admission of the evidence. Accordingly, we hold that appellant has preserved for our
review the trial court's denial of his motion to suppress the evidence.

Standard of Review

 The appropriate standard for reviewing a trial court's ruling on a motion to
suppress evidence is bifurcated, giving almost total deference to a trial court's
determination of historical facts and reviewing de novo the court's application of the
law. Maxwell v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We "should
afford the same amount of deference to trial courts' rulings on 'application of law to
fact questions,' also known as 'mixed questions of law and fact,' if the resolution of
those ultimate questions turns on an evaluation of credibility and demeanor." 
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Finally, we conduct a
de novo review where the resolution of mixed questions of law and fact do not turn
on an evaluation of credibility and demeanor. Id. Thus, when, as here, we have a
videotaped statement and an uncontroverted version of events, we review the trial
court's ruling on an application of law to facts de novo. Herrera v. State, 194 S.W.3d
656, 658 (Tex. App.--Houston [14th Dist.] 2006, pet. ref'd).

 In reviewing a trial court's ruling, we generally consider only evidence
adduced at the suppression hearing because the ruling was based on it rather than
evidence introduced later. Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.
1996). However, this general rule is inapplicable where the suppression issue has
been consensually re-litigated by the parties during the trial on the merits. Id. Where
the State raises the issue at trial either without objection or with subsequent
participation in the inquiry by the defense, the defendant has made an election to
re-open the evidence, and consideration of the relevant trial testimony is appropriate
in our review. Id. In the instant case, because appellant fully participated in the re-litigation of the issue during his cross-examination of Officer Mejia, we consider
Mejia's trial testimony in our review of the trial court's suppression ruling. (4)

Voluntariness of Statement

 Appellant filed his pre-trial motion to suppress his statement, contending that
Officer Mejia's interrogation of appellant violated the Fifth, Sixth, and Fourteenth
Amendments of the United States Constitution, (5) article I, section 10 of the Texas
Constitution, (6) and articles 1.05 and 38.22 of the Texas Code of Criminal Procedure. (7) 
The trial court denied appellant's pre-trial motion to suppress and filed written
findings of fact and conclusions of law. The findings reflect that the trial court
determined that appellant was read "his rights in accord with Article 38.22," was not
"coerced or threatened . . . to give a statement," was not promised "anything to induce
[appellant] to give a statement," and that the statement was "voluntarily" made.

 Appellant argues that his statement was involuntary because Officer Mejia told
him that "if he did not confess to [the] alleged crime, he would serve a long sentence
and he would be sexually abused by other inmates."

 "A statement of an accused may be used in evidence against him if it appears
that the same was freely and voluntarily made without compulsion or persuasion." 
Tex. Code. Crim. Proc. Ann. art. 38.21 (Vernon 2005). For a promise to render a
confession invalid under article 38.21, the promise must be positive, made or
sanctioned by someone in authority, and of such an influential nature that it would
cause a defendant to speak untruthfully. Martinez v. State, 127 S.W.3d 792, 794
(Tex. Crim. App. 2004). The truth or falsity of a statement is irrelevant to a
voluntariness determination not only under federal constitutional law but also under
state law. Id. at 794-95. Under Texas law, the determination is whether the officially
sanctioned positive promise would be likely to influence the defendant to speak
untruthfully and not whether the defendant in fact spoke untruthfully. Id. at 795. 
Under federal law, we must focus on official coercion as it impacts the free will of the
accused. Smith v. State, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989).

 At trial, Officer Mejia denied making any promises to appellant in return for
the statement or threatening or coercing appellant. Our review of the videotaped
statement reveals that after appellant was read his legal rights, he indicated that he
understood those rights and at no time indicated that he wished to speak with a
lawyer. During the interview, Mejia stated to appellant, "[i]f you feel repentant for
what happened, I don't know if they'll give you less time. Instead of giving you 30
years in the penitentiary, they might give you 10. Or even probation. I don't know." 
Later during the interview, Mejia stated, "[y]ou won't be able to bear the pen, man. 
You won't bear it. They're going to put a dress on you. They're going to put a dress
on you and then they're going to make you a girlfriend there. Because you're very
pretty. You have a pretty face." 

 Although Officer Mejia did predict that appellant would not be able to tolerate
prison life and would be subject to sexual abuse, the record firmly establishes that he
did not make any positive promise to appellant at all. In fact, the record reveals that
Mejia specifically told appellant, "I don't know if they'll give you less time." Thus,
Mejia did not directly or indirectly promise appellant anything or otherwise induce
him to give his statement. Moreover, Mejia did not threaten or coerce appellant into
speaking with him. Accordingly, we hold that the trial court did not err in denying
appellant's motion to suppress his statement.

 We overrule appellant's second issue.

Ineffective Assistance of Counsel

 In his third issue, appellant argues that he was denied effective assistance of
counsel because his trial counsel told appellant "that the jury could not give him
probation for aggravated robbery." Appellant asserts that this statement "was clearly
erroneous and [his] decision to not have a jury assess his punishment was unknowing
and involuntary" and "should not reasonably be considered sound trial strategy."

 The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby appellant must show
that (1) counsel's performance fell below an objective standard of reasonableness,
and (2) but for counsel's unprofessional error, there is a reasonable probability that
the result of the proceedings would have been different. 466 U.S. at 687, 104 S. Ct.
at 2064; Vasquez v. State, 830 S.W.2d 948, 949 (Tex. Crim. App. 1992). Strickland
defines reasonable probability as a "probability sufficient to undermine confidence
in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's
performance, we look to the totality of the representation to determine the
effectiveness of counsel, indulging a strong presumption that his performance falls
within the wide range of reasonable professional assistance or trial strategy. 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A claim of
ineffective assistance must be firmly supported in the record. Id. 

 Here, at the pretrial hearing, the following exchange occurred between
appellant and his trial counsel:

[Appellant's Counsel]: I've also explained to you that you have the
right to have the Court impose your
punishment or have the jury impose your
punishment; is that correct?


[Appellant]: Yes.

[Appellant's Counsel]: I've explained to you that if the Court
imposes your punishment, and you're found
guilty of aggravated robbery, that you do not
qualify for a probation. You understand that
she cannot give you probation?


[Appellant]: Yes.

[Appellant's Counsel]: All the Judge can do is give you time in
prison; you understand that?


[Appellant]: Yes.

[Appellant's Counsel]: The jury can't consider giving you probation
if they find you guilty of aggravated robbery,
okay?


[Appellant]: Yes.

[Appellant's Counsel]: You also understand that if the jury would
give you a probation, and you got deported,
that in all likelihood you would have a
warrant out for your arrest for failure to
comply with the terms and conditions of a
probation, if you got lucky enough to get
probation from a jury; you understand that,
too?


[Appellant]: Yes.

[Appellant's Counsel]: Knowing that you have a choice of having the
Judge set your punishment, do you want the
Judge to set the punishment or you want the
jury? I've recommended the Judge to you.


[Appellant]: The Judge.

(emphasis added). Based on the record, either appellant's trial counsel misspoke
when he told appellant that the jury "can't" consider probation, the court reporter
misunderstood counsel, or the court reporter made a stenographic error. If counsel
actually misspoke, any harm resulting from that statement was cured when counsel
later in the exchange stated, "if the jury would give you a probation," clearly
indicating that the jury could possibly sentence appellant to probation. In either
event, the performance of appellant's trial counsel cannot be said to have fallen below
an objective standard of reasonableness. Accordingly, we hold that appellant has not
established that his trial counsel's performance fell below an objective standard of
reasonableness.

 We overrule appellant's third issue.


Conclusion


 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Higley.


Do not publish. Tex. R. App. P. 47.2(b).
1. See Tex. Pen. Code Ann. § 29.03 (Vernon 2003).
2. Prior to trial, appellant filed a motion to suppress the videotape, which was denied by
the trial court.
3. The appellate record does not include a record of a hearing on the motion to suppress.
4. We note that appellant, in his brief, cites to Officer Mejia's trial testimony to support
his argument that the videotaped statement was inadmissible.
5. U.S. Const. amends. V, VI, and XIV.
6. Tex. Const. art. I, § 10.
7. Tex. Code Crim. Proc. Ann. arts. 1.05, 38.22 (Vernon 2005).