Opinion issued May 3, 2007



 



 







In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00619-CR






ALEJANDRO MARTINEZ, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 184th District Court

Harris County, Texas

Trial Court Cause No. 989812






MEMORANDUM OPINION


 A jury convicted appellant, Alejandro Martinez, of capital murder. See Tex.
Pen. Code Ann. § 19.03(a)(7)(A) (Vernon Supp. 2006). The State did not seek the
death penalty, and the trial court sentenced appellant to life in prison. See Tex. Pen.
Code Ann. § 12.31(a) (Vernon Supp. 2006). In three points of error, appellant
contends that (1) the trial court erred by denying his motion to suppress his
videotaped statement; (2) the evidence was factually insufficient to support his
conviction; and (3) the trial court erred by denying his requested jury instruction on
the voluntariness of his videotaped statement.

 We affirm.

Background


 At 3 a.m. on May 17, 2004, Darreon King stumbled to the home of the Taylor
family and knocked on the door. King was bleeding and said that he had been shot. 
The family called 9-1-1 and soon the police arrived. King later died at the hospital
of multiple gunshot wounds. 

 King's best friend, Tony Washington, was later found in his car in an apartment
complex parking lot. Washington had also died of gunshot wounds. Ballistics
evidence later determined that the same firearm had been used to kill both King and
Washington. 

 From Washington's cellular telephone records, the police developed appellant
as a suspect. The police learned that appellant was staying with his mother in Roma,
Texas. Houston police homicide investigators, B. McDaniel and R. Moreno, traveled
to Roma to interview appellant. The officers went to the home of appellant's mother. 
Apellant agreed to accompany the officers to the Roma police station for an
interview. During the interview, appellant admitted to shooting King and
Washington. Appellant then provided a videotaped statement in which he gave the
following description of the events surrounding the shootings:


 King approached appellant on the street and told him that he had some friends
who wanted to buy 30 pounds of marijuana. 

 Appellant contacted Clint Owens, who agreed to supply the marijuana. 
Appellant told King to come back with his friends.

 Less than one hour later, appellant, Owens, and King returned. Washington
arrived in his car. The buyers arrived in a van. Owens's cousin was also
present.

 Washington and King approached the van to conduct the transaction. 
Washington gave the marijuana to the buyers, and King got the money and
gave it to Owens.

 After receiving the money, Owens realized that it was fake. At this point, the
buyers had already driven off in the van.

 Owens pointed a gun at appellant, but then told appellant that he knew it was
not appellant's fault.

 Owens then pointed the gun at Washington and King and asked, "Where's the
money [and] where's the people?" Owens then forced King and Washington
into his truck.

 Owens, appellant, Owens's cousin, King, and Washington drove around in
Owens's truck looking for the buyers, without success. King and Washington
told Owens that they had known the buyers for only one week and did not
know how to locate them.

 Owens became angry and whispered to appellant that "either its you or them." 
Appellant understood this to mean that if he did not kill King and Washington,
then Owens would kill him. Appellant noticed that Owens had two guns in the
truck. 

 Eventually, the men returned to the site of the drug transaction without locating
the buyers.

 Owens told appellant when appellant got out of Owens's vehicle, "I'm going
to call you[.] [A]s soon as I call you[,] its [sic] gonna ring one time[.] You
know what to do." Owens gave appellant a gun that was already cocked.

 Owens forced Washington and King into Washington's car with appellant. 
King was in the driver's seat, Washington was in the passenger seat, and
appellant was in the backseat behind King. 

 As the car approached a stop sign, Owens called appellant, and appellant shot
Washington in the chest. Appellant then shot King.

 The car rolled into a "ditch or field" and appellant shot King again. Appellant
left the scene with the gun.

 Owens took Washington's car to a friend's house. 

 Owens then picked up appellant, and they went to pick up Washington's car. 
Owens told appellant to shoot Washington again "so I can know he's dead."
Appellant shot Washington again. 

 Appellant and Owens abandoned Washington's car, with his body still in it, at
an apartment complex.

 Owens told appellant that he would have killed appellant if appellant had not
killed King and Washington.

 Appellant went to his mother's house in Roma because he feared Owens.


 Appellant was indicted for capital murder. He filed a pre-trial motion to
suppress his videotaped statement, contending that the statement had been
involuntarily made. The trial court denied the motion to suppress. 

 The case was tried to a jury. At trial, the defense argued that appellant shot
King and Washington because appellant believed that Owens would kill him if he did
not shoot the two men. In this regard, the jury received an instruction on the
affirmative defense of duress, which it implicitly rejected when it found appellant
guilty of capital murder. As statutorily required, the trial court sentenced appellant
to life in prison. 

Motion to Suppress


 In his first point of error, appellant contends that the trial court "erred in
denying the appellant's motion to suppress his statement as such statement was
involuntarily given and in violation of the Texas Constitution."

A. The Motion to Suppress Hearing

 At the motion to suppress hearing, the State and the defense offered differing
versions of the events surrounding appellant's videotaped statement. Appellant
testified to the following description of the events:


 Appellant was watching television at his mother's home in Roma when he
heard a knock at the door.

 When appellant opened the door, a Roma police officer pointed a gun at
appellant, and appellant said, "Don't shoot."

 The police officer then pulled appellant outside while another Roma police
officer was "holding a gun to [appellant's] face."

 The officer then shoved appellant into a chair while another continued to point
a gun at appellant.

 Appellant was afraid because he did not know what the officers wanted.

 A Houston police officer then asked appellant if he would go to the police
station to answer some questions. Appellant believed that he had no choice but
to go to the police station "with the weapons drawn and everything."

 Two Houston police officers and several Roma police officers took appellant 
to the police station. 

 Appellant was brought into a room at the police station where he was
interviewed by two Houston police officers. Appellant still felt afraid at this
point and "didn't know what to expect."

 The Houston police officers told appellant about a homicide that had occurred
in Houston, and appellant told them that he "didn't know nothing."

 The Houston police officers interviewed appellant for approximately two hours
before he gave the videotaped statement in which he confessed to killing King
and Washington. 

 During the interview, the police officers showed appellant pictures of the
victims' bodies, told appellant that he could receive the death penalty,
continued to pressure appellant to confess to the murders even though
appellant repeatedly said he knew nothing, and told appellant that, if he
confessed, the officers would ask the trial judge to be lenient.

 Appellant asked to go home early in the interview, but the officers ignored the
request.

 Appellant was given "Miranda warnings" before he gave the videotaped
statement, but he did not understand his rights. Appellant was confused and
intimidated by the officers' conduct throughout the entire process. Appellant
attributed his confusion and intimidation throughout the entire interview
process to the officers' actions of drawing their guns when they initially picked
him up.

 If he had understood his rights, appellant would have asked for an attorney and
never would have confessed.

 Appellant had no knowledge of the details of the murders; rather, the officers
guided appellant through the confession.


 At the hearing on the motion to suppress, the State presented the testimony of
Officers McDaniel and Moreno. The officers' account of the events surrounding the
videotaped statement differed from appellant's account in a number of pertinent
respects. Either one or both of the officers testified to the following:


 When the officers went to the residence of appellant's mother, Officer
McDaniel was one of the officers located at the front of the residence. Officer
McDaniel never saw any police officer point a gun at appellant or pull a gun
from a holster. 

 Officer Moreno was on the side of the residence when the officers initiated
contact with appellant. He never saw any guns pointed at appellant, and
appellant never mentioned during the interview that Roma officers had pointed
guns at him.

 Appellant voluntarily went to the Roma police station to be interviewed. He
was not under arrest at that point.

 When they arrived at the police station, Officer McDaniel told appellant that
he was free to leave the station at any time.

 Before the interview began, Officer McDaniel told appellant that (1) appellant
had the right to remain silent and not to make a statement and any statement
that appellant made could be used against him at trial; (2) any statement could
be used against appellant in court; (3) appellant had a right to have a lawyer
present to advise him prior to and during questioning; (4) if appellant could not
employ a lawyer, one would be appointed; and (5) appellant had the right to
terminate the interview at any time. Appellant indicated to the officers that he
understood these rights and was willing to talk to the officers.

 Appellant never invoked his right to remain silent, never requested an attorney,
never asked to terminate the interview, and never asked to go home.

 The officers did not threaten appellant and did not promise him that they would
ask the judge to be lenient if he confessed.

 Appellant never asked the officers "to stop pressuring him."

 Appellant was "very cooperative" during the interview and appeared relieved
"to finally talk about what happened."

 During the two-to-three hour interview, appellant gave four or five versions of
the events surrounding the shootings.

 At various points in the questioning, the police officers would ask appellant if
he was lying, and he would admit that he was.

 Before he gave the videotaped statement, appellant was once more advised of
his rights. Appellant again waived these rights and provided the videotaped
statement.


 The State also introduced the videotaped statement into evidence. The
videotaped statement reflects that the officers informed appellant of his statutory
rights and that appellant chose to waive these rights by giving the statement. The
videotaped statement also shows that appellant responded affirmatively when asked
if he had agreed to accompany the officers to the police station.

 At the conclusion of the hearing, the trial court denied appellant's motion to
suppress and made the following oral findings of fact and conclusions of law:

 [T]he defendant was not under arrest at the time the confession was
made, and he was not placed under arrest at the time the confession was
made, and he was not placed under arrest at the home in Roma. I
specifically find that no firearms were drawn. I find that the Miranda
warnings were given by Sergeant [B.] McDaniel. I find that the
defendant understood those warnings, and that he freely and voluntarily
waived his rights. I specifically find that he did not say he wanted to go
home while he was being questioned. And I find that there were no
promises or threats made. Specifically, I find that the confession was
made under voluntary conditions, and that the statement was freely and
knowingly given.

B. Standard of Review

 We review a trial court's ruling on a motion to suppress evidence pursuant to
an abuse of discretion standard. See Villarreal v. State, 935 S.W.2d 134, 138 (Tex.
Crim. App. 1996). At a suppression hearing, the trial court is the sole fact-finder and
may choose to believe or disbelieve any or all of the witnesses' testimony. State v.
Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We give almost total deference
to the trial court's determination of historical facts when supported by the record,
particularly if the findings turn on witness credibility and demeanor. Id. at 856. We
give the same deference to determinations of mixed questions of law and fact if their
resolution depends upon witness credibility and demeanor. Id. In contrast, we review
issues that present purely legal questions pursuant to a de novo standard. Id. We
must view the record and all reasonable inferences therefrom in the light most
favorable to the ruling on the suppression motion, and sustain the ruling if it is
reasonably supported by the record and is correct under any theory of law applicable
to the case. Villarreal, 935 S.W.2d at 138.

C. Voluntariness of Appellant's Statement

 Appellant contends that the record does not support the trial court's ruling that
his statement was voluntarily made. To be admissible, a confession must be
voluntarily given and free from coercion or improper influences. See Wyatt v. State,
23 S.W.3d 18, 23 (Tex. Crim. App. 2000). In determining the question of
voluntariness, a court should consider the totality of circumstances under which the
statement was obtained. Creager v. State, 952 S.W.2d 852, 855 (Tex. Crim. App.
1997). The ultimate question is whether the appellant's will was overborne. Id. at
856. A statement is involuntary "only if there was official, coercive conduct of such
a nature that any statement obtained thereby was unlikely to have been the product
of an essentially free and unconstrained choice by its maker." Alvarado v. State, 912
S.W.2d 199, 211 (Tex. Crim. App. 1999).

 Appellant presents three arguments to support his contention that the statement
was not voluntarily made. Appellant first acknowledges that the State presented
evidence supporting the trial court's finding that no officer drew a weapon, but
contends that "it is beyond belief that officers investigating a violent double homicide
such as this would not have their arms at the ready when going to appellant's house." 
For this reason, appellant contends that his testimony regarding the officers' use of
weapons "should be credited." 

 We disagree. As the fact finder, the trial court was free to believe the officers'
testimony regarding the use of weapons and disbelieve that of appellant. See Ross,
32 S.W.3d at 854. Without more, we must defer to the trial court's credibility
determination. 

 Appellant next contends that his statement was involuntary because he was
"subjected to an intensive and extensive interrogation." He relies on the fact that the
officers "talked to him for well over two hours before they finally reduced his
statements to tape." Although the length of an interrogation may be a consideration
in determining the voluntariness of a statement, we agree with the State that two to
three hours of questioning does not render a statement involuntary. This is
particularly true in cases, such as this, in which evidence was presented showing that
appellant had been twice given his rights, told repeatedly that he could leave, and yet
voluntarily chose to continue the interview. Other courts have held that questioning
of much longer durations did not render a confession involuntary under analogous
circumstances. See, e.g., Smith v. State, 779 S.W.2d 417, 429 (Tex. Crim. App. 1989)
(holding that eight hours of questioning without food did not render confession
involuntary in light of appellant's willingness to continue, being Mirandized, and
understanding his rights); Bell v. State, 169 S.W.3d 384, 391-92 (Tex. App.--Fort
Worth 2005, pet. ref'd) (holding that eight hours of questioning while in handcuffs
and leg shackles did not render confession involuntary when appellant never
indicated he did not want to answer any more questions or that he wanted to speak to
attorney, and never requested food, water, or bathroom breaks). 

 Lastly, appellant contends that his statement was given involuntarily because
"the officers kept pressing [him] that his statement was inconsistent with the physical
evidence." On cross-examination, Officer Moreno testified that appellant admitted
at various times throughout the interview that he was lying. The following exchange
then occurred between the defense and Officer Moreno:

 Q. Officer McDaniel had a set of facts in his mind as to how the
[murders] had happened?" 


 A. That's possible, yes, sir.


 Q. All right. And if [appellant] said something that didn't match his
facts, he would call it a lie or pressure him a little bit, just tell us what
really happened, is that they way it happened?


 A. I wouldn't say it was pressuring. It was just not matching with the
physical evidence McDaniel had.


 Q. And you would have kept [appellant] there until the evidence started
to match up to his physical evidence?


 A. To what we knew based on physical evidence that we had.

 Although Officer McDaniel apparently confronted appellant by pointing out
that appellant's statements did not match the evidence in the case, nothing in the
record suggests the officer's tactics improperly compelled appellant to continue the
interview. See State v. Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (telling
suspect "what had to be" in statement not type of practice held to be inherently
coercive); see also Stevenson v. State, 780 S.W.2d 294, 298 (Tex. App.--Tyler 1989,
no pet.) ("A confession is not rendered inadmissible because it is made after an
accused has been told by an officer taking the confession that it would be best to tell
the truth . . . ."). Rather, the officers' testimony and the videotaped statement itself
reflect that appellant's statement was voluntarily made, without coercion, and
occurred after appellant had been fully informed of his rights. As fact finder, the trial
court was entitled to believe this evidence and conclude that appellant had waived his
rights and made the statement voluntarily.

 We hold that appellant has not shown that the trial court abused its discretion
by denying his motion to suppress the videotaped statement.

 We overrule appellant's first point of error.

Voluntariness Instruction


 In his third point of error, appellant contends that "the trial court erred in
denying the appellant's requested instruction on the voluntariness of the appellant's
statement pursuant to article 38.22, section 6 of the Code of Criminal Procedure." 
Appellant specifically contends that the following trial evidence presented by the
State sufficiently raised the issue of voluntariness of the confession: (1) appellant was
"removed from his mother's house and taken to the Roma Police Department"; (2)
officers from two agencies were involved; (3) the officers were all armed; (4)
appellant was questioned for over two hours before he provided the videotaped
statement; and (5) "there is no indication that he was allowed to tell his family where
he was being held." (1)

 Code of Criminal Procedure article 38.22, section 6 provides that the trial court
must, in the absence of the jury, make an independent finding regarding whether the
statement was made voluntarily. Tex. Code Crim. Proc. Ann. art. 38.22, § 6
(Vernon 2005). If the trial court finds that the statement was made voluntarily,
evidence pertaining to its voluntariness may be submitted to the jury, and the court
must instruct the jury that it may not consider the confession unless it believes,
beyond a reasonable doubt, that the confession was voluntarily made. Id.; Miniel v.
State, 831 S.W.2d 310, 316 (Tex. Crim. App. 1992). Section 7 of article 38.22 further
requires that, when the voluntariness issue is raised by the evidence, the trial court
shall instruct the jury on the law pertaining to the statement. Tex. Code Crim. Proc.
Ann. art. 38.22, § 7 (Vernon 2005); Miniel, 831 S.W.2d at 316. 

 Before this requirement is triggered, some evidence must be presented to the
jury that raises the voluntariness issue. Butler v. State, 872 S.W.2d 227, 236 (Tex.
Crim. App. 1994). "Only when some evidence is presented that a confession is not
voluntary is the matter put in issue." Miniel, 831 S.W.2d at 317 (emphasis added). 
Thus, we must determine whether the evidence cited by appellant raised the issue of
voluntariness.

 Appellant argues that evidence showing he was "removed" from his mother's
house raised the voluntariness issue. Despite appellant's characterization, no
evidence was presented at trial that appellant was "removed" by the officers. That is,
no evidence was presented at trial indicating that the officers did or said anything to
make appellant believe that he had no choice but to accompany them. Rather, the
evidence presented at trial showed that appellant was not under arrest at the time and
that he willing accompanied the officers to the Roma police station. Evidence
showing only that appellant responded affirmatively to the officers' request to
accompany them does not raise the issue of voluntariness. See Miniel, 831 S.W.2d
at 317 ("Evidence presented by the State in anticipation of an attack upon the
voluntariness of a confession does not put voluntariness in issue."). 

 Appellant submits that voluntariness was raised because officers from two
agencies were involved and because the officers were armed. While the evidence
showed that the officers were armed, no evidence was presented indicating that any
officer removed a weapon from its holster or engaged in any show of force. The fact
that officers from two agencies were involved is not inherently suggestive of
coercion, and appellant does not explain how voluntariness was raised by such fact.

 Appellant also contends that the length of his questioning--"well over two
hours"--raised the issue of voluntariness. During this time period, the record reflects
that appellant was informed of his rights and told that he was free to terminate the
questioning and leave. Appellant chose to waive these rights and speak to the police
for over two hours, and then chose to give a videotaped statement. The record also
shows that, on the way to the police station, the officers offered to stop to get
appellant something to eat and that, during the interview, appellant was allowed to
take a bathroom break. 

 Lastly, appellant claims that he was entitled to a voluntariness instruction
because there is no evidence that he was "allowed to tell his family where he was
being held." We agree with the State that the lack of such evidence in the record does
not necessarily raise the issue of voluntariness, particularly when the totality of
evidence in the record indicates that appellant affirmatively waived his rights and
gave the statement voluntarily. Absent some positive evidence that appellant's
statements were coerced, we cannot conclude that the trial court abused its discretion
when it did not give the requested instruction. See Janecka v. State, 937 S.W.2d 456,
472 (Tex. Crim. App. 1996).

 We overrule appellant's third point of error.

Duress


 In his second point of error, appellant contends that the evidence is factually
insufficient for the jury to have rejected his affirmative defense of duress. 

 Duress is an affirmative defense to prosecution when a defendant establishes
by a preponderance of the evidence that he "engaged in the proscribed conduct
because he was compelled to do so by threat of imminent death or serious bodily
injury to himself or another." Tex. Pen. Code Ann. § 8.05(a) (Vernon 2003); see
also Edwards v. State, 106 S.W.3d 833, 843 (Tex. App.--Dallas 2003, pet. ref'd). 
There are two components of immediacy in an imminent threat: (1) the person making
the threat must intend and be prepared to carry out the threat immediately and (2)
carrying out the threat must be predicated upon the threatened person's failure to
commit the charged offense immediately. Anguish v. State, 991 S.W.2d 883, 886
(Tex. App.--Houston [1st Dist.] 1999, pet. ref'd). 

 This affirmative defense is not available to a defendant if he intentionally,
knowingly, or recklessly placed himself in a situation in which it was probable that
he would be subject to compulsion. Tex. Pen. Code Ann. § 8.05(d) (Vernon 2003). 
Compulsion exists only if the force or threat of force would render a person of
reasonable firmness incapable of resisting the pressure. Tex. Pen. Code Ann.
§ 8.05(c); Edwards, 106 S.W.3d at 843. 

 When a defendant asserts an affirmative defense, the reviewing court considers
all the evidence and determines whether the judgment rendered is so against the great
weight and preponderance of the evidence as to be manifestly unjust. Edwards, 106
S.W.3d at 843; see also Meraz v. State, 785 S .W.2d 146, 154 (Tex. Crim. App.
1990). In making this determination, we must accord due deference to the fact
finder's determinations, particularly those determinations concerning the weight and
credibility of the evidence. Edwards, 106 S.W.3d at 843.

 Appellant asserts that he established the affirmative defense of duress through
his videotaped statement in which he claimed that he killed King and Washington
because Owens threatened to kill him if he did not kill the two men. Appellant
contends that he believed that Owens would kill him if he did not do as Owens
directed because appellant knew that Owens was heavily involved in the drug trade
and had exhibited violent tendencies in the past, particularly with regard to protecting
his illegal drug business. Appellant stated that he had heard Owens say in the past
that he would kill anyone who "messed" with him. Appellant claimed that he feared
that Owens would blame him for the botched drug deal. Appellant also saw that
Owens had firearms in his possession on the night of the murders, including an
assault rifle. Appellant further cites to his claim that Owens was nearby in his own
vehicle when the murders took place.

 Appellant also relies on post-murder events to further show that Owens was
someone with a violent nature, whom appellant legitimately feared. Appellant told
the police that Owens directed appellant to shoot Washington a second time, even
though Washington was already dead. Appellant further claimed that, after the
murders, Owens had threatened to kill him and his own cousin if either talked about
the murders. Appellant also told the police that he went to Roma because he feared
Owens. Lastly, appellant cites evidence that, when Owens was eventually arrested,
the police found a large quantity of illegal drugs, cash, and an assault rifle, as
described by appellant, in Owens's vehicle.

 The jury's verdict of guilt in this case was an implicit rejection of appellant's
testimony that he acted under duress. We disagree with appellant that the evidence
was factually insufficient to support the jury's rejection of his affirmative defense of
duress. As the exclusive judges of the facts, the credibility of the witnesses, and the
weight to be given their testimony, a jury may believe or disbelieve all or any part of
a witness's testimony. See McKinny v. State, 76 S.W.3d 463, 468-69 (Tex.
App.--Houston [1st Dist.] 2002, no pet.); see also Edwards, 106 S.W.3d at 843.
Here, the jury was entitled to believe appellant's statement to the extent that he
admitted killing King and Washington but disbelieve appellant's self-serving claim
that he committed the murders because Owens threatened to kill him if he did not. 

 Even if it believed all of appellant's statements, the jury could have determined
that any threat Owens made was not an imminent threat. Owens was not in the car
with appellant and the two murder victims; rather, Owens was in his own vehicle at
the time of the killings. Appellant, who was himself armed, was alone in the car with
King and Washington when he committed the murders. 

 Finally, appellant admitted that he knew that Owens was a violent person.
Nevertheless, appellant contacted Owens regarding the purchase of marijuana and
chose to facilitate an illegal drug transaction involving Owens. In doing so, the jury
could have concluded appellant intentionally, knowingly, or recklessly placed himself
in a situation in which it was probable he would be subject to compulsion. See Tex.
Pen. Code Ann. § 8.05(d). 

 After viewing all of the evidence, we conclude the jury's rejection of
appellant's affirmative defense of duress is not so against the great weight and
preponderance of the evidence as to be manifestly unjust. Thus, we hold that the
evidence was not factually insufficient, as claimed by appellant.

 We overrule appellant's second point of error.

Conclusion


 We affirm the judgment of the trial court.





 Laura Carter Higley

 Justice


Panel consists of Justices Nuchia, Keyes, and Higley.


Do not publish. Tex. R. App. P. 47.2(b).
1. Appellant did not testify at trial.